UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
L.I. HEAD START CHILD DEVELOPMENT
SERVICES, INC., PAUL ADAMS, derivatively
on behalf of COMMUNITY ACTION INSURANCE
AGENCIES GROUP and class representatives of
all other persons similarly situated,

**MEMORANDUM OF
DECISION AND ORDER**

Plaintiffs,

- against -                                             CV 00-7394 (ADS)

ECONOMIC OPPORTUNITY COMMISSION
OF NASSAU COUNTY, INC., ECONOMIC
OPPORTUNITY COUNCIL OF SUFFOLK, INC.,
YONKERS COMMUNITY ACTION PROGRAM,
INC., and STELLA B. KEARSE as Representative
of the ESTATE OF JOHN L . KEARSE, Deceased.

Defendants.
-----------------------------------------------------------------x

A P P E A R A N C E S :

WELBY, BRANDY & GREENBLATT, LLP
Attorneys for Plaintiffs
11 Martine Avenue
White Plains, New York 10606
By:     Alexander A. Miuccio, Esq.
            of Counsel

MARK E. GOIDELL, ESQ.
Attorney for Defendants
Economic Opportunity Commission
  of Nassau County, Inc and
Yonkers Community Action Program Inc.
1355 Motor Parkway
Hauppauge, NY 11749

BARRY V. PITTMAN, ESQ.
Attorney for Defendant
Economic Opportunity Council of Suffolk, Inc.
26 Saxon Avenue
P.O. Box 5647
Bay Shore, NY 11706-0455

LAW OFFICES OF FREDERICK K. BREWINGTON
Attorneys for Defendant
Stella B. Kearse as Representative of the Estate of
John L. Kearse, Deceased
By: Frederick K. Brewington, Esq. and
    Eric M. Sarver, Esq.
    Of Counsel

**SPATT, District Judge.**

This is the second installment of a continuing saga involving an employee

health and welfare benefit fund; a former participating not-for-profit organization;

three participating not-for-profit organizations; and a trustee of the fund. This action

was commenced on December 13, 2000. Primarily, it is based on alleged violations

of the Employee Retirement Income Security Act of 1974 ("ERISA") 29 U.S.C. §

1001, *et seq.*.

ERISA is a comprehensive statute enacted to protect the interests of

participants in employee benefit plans and their beneficiaries "by establishing

standards of conduct, responsibility, and obligation for fiduciaries of employee

benefit plans." ERISA § 2(b), 29 U.S.C. § 1001(b). Section 404 of ERISA, 29

U.S.C. § 1104, sets forth a fiduciary's basic duties, as derived from traditional trust

law principles. Pursuant to this section, fiduciaries must act "with the care, skill,

prudence, and diligence under the circumstances then prevailing that a prudent man

acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Whitfield v. Tomasso*, 682 F. Supp. 1287, 1301 (E.D.N.Y. 1988). Thus, as fiduciaries, the Trustees of the defendant not-for-profit organizations and the defendant-trustee have a duty to act with care, skill, prudence and diligence in the management of the Fund. *Id.*

## I. THE PRIOR PROCEEDING

The plaintiff L.I. Head Start Child Development Services, Inc. ("L.I. Head Start") was a participating agency in the Community Action Agencies Insurance Group ("CAAIG") from November 30, 1985 to September 1, 1992. The purpose of CAAIG was to provide health benefits to the participants who were minorities and low and middle income persons and families. This was an attempt to provide quality health services to low income people.

In a decision made in a prior action initiated by L.I. Head Start, *Long Island Head Start Child Development Services, Inc. v. John L. Kearse, et al.*, 86 F. Supp. 2d 143 (E.D.N.Y. 2000), ("The CAAIG Action"), this Court determined that: when L.I. Head Start withdrew as a participating employer in CAAIG as of September 1, 1992, the surplus reserves allocable to contributions made on behalf of L.I. Head Start's participating employees was the sum of $497,736, as the L.I. Head Start share of the reserves. The Court notes that the defendants in the prior lawsuit were John L. Kearse, Judith Wilson and Alphonso Anderson as Trustees of CAAIG and CAAIG itself. The other CAAIG participating members: namely, Economic Opportunity

Commission of Nassau County, Inc. ("EOC Nassau"), Economic Opportunity Council of Suffolk County, Inc. ("EOC Suffolk") and Yonkers Community Action Program, Inc. ("Yonkers CAP") were not named as defendants in the prior action. As stated above, the underlying claim in that first action related to L.I. Head Start's demand for the return of its reserves that CAAIG held upon its withdrawal from CAAIG; CAAIG's refusal to return the reserves; and the alleged diversion of these reserve monies for the benefit of employees and persons other than the L.I. Head Start employees. In the decision in the first action, the Court determined that CAAIG segregated the contributions of each of the participating employers. CAAIG and the trustees of CAAIG were directed to transfer the sum of $497,736, to a trust fund for the benefit of the class plaintiffs within 60 days from March 3, 2000.

On May 25, 2000, judgment was entered by the Clerk of the Court against the defendants in the CAAIG action in the sum of $802,831.57, which sum includes the principal sum of $497,736 plus pre-judgment interest in the sum of $131,271.79, attorneys fees in the sum of $151,375 and costs in the sum of $22,448.78. Apparently, no appeal was taken from this judgment. According to the complaint in the present action, this judgment remains unpaid, except for the sum of $45,375.19, leaving a balance due of $757,456.38 plus interest from December 14, 2000.

## II.  The Stipulated Facts

The attorney for the plaintiffs and the attorneys for the defendants EOC Nassau, EOC Suffolk and Yonkers CAP stipulated to the following facts:

1.  Plaintiff, L.I. Head Start Child Development Services, Inc. formerly known as Long Island Day Care Services, Inc., is a not-for-profit corporation organized and existing under the laws of the State of New York.

2.  Community Action Agencies Insurance Group ("CAAIG") or "CAAIG FUND") was an employee welfare benefit plan within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1). [*See L.I. Head Start*, 86 F. Supp. 2d at 144-45].

3.  The CAAIG Trust Fund was established for the sole and exclusive purpose of providing health and welfare benefits to employees of the participating/contributing employers within the meaning of ERISA §§ 1103(c)(1) and 1104(a)(1)(A), 29 U.S.C. §§ 1103(c)(1) and 1104(a)(1)(A). (*Id.* at 144).

4.  The CAAIG Fund provided health, medical, dental and other benefits for the employees of defendant Economic Opportunity Commission of Nassau County, Inc., defendant Economic Opportunity Council of Suffolk, Inc., and any other employer who became a participating employer. (*Id.*  at 144).

5.  On November 30, 1985, plaintiff L.I. Head Start became a participating employer in the CAAIG Fund. (*Id*. at 145).

6.  At the time that L.I. Head Start became a participating employer in the CAAIG Fund, defendants EOC Nassau, EOC Suffolk and Yonkers Community

Action Program, Inc. ("Yonkers CAP") also were participating employers in the CAAIG Fund. (*Id.* at 145).

7. As of August 31, 1992, the financial statements of CAAIG indicated that the total amount of the reserves for all contributing employers was $1,117,507. (*Id.* at 145).

8. On September 1, 1992, L.I. Head Start elected to terminate its participation in the CAAIG Trust and requested the immediate return of the unspent monies in CAAIG's reserves attributable to past contributions made by L.I. Head Start on behalf of its participating employees. (*Id.* at 145).

9. On May 25, 2000, this Court entered a judgment in the Prior Action in favor of L.I. Head Start and the class plaintiffs against CAAIG and its Trustees for the sum of $802,831.57, including interest and attorney's fees.

10. Defendant Kearse served as a trustee of CAAIG since its inception in 1983 to June, 1998. Adrian Fassett ("Fassett") also served as a trustee of CAAIG from 1993 to June 11, 1998, when he resigned as trustee. Edward Hull ("Hull") also served as a trustee of CAAIG from 1994 to June 11, 1998, when he resigned as a trustee.

11. The October 4, 1983 Trust Agreement governing the CAAIG Fund provided for the participating agencies to operate and administer the CAAIG plan.

12. The three defendant agencies, EOC Nassau, EOC Suffolk and Yonkers CAP, delegated the authority to administer and operate the CAAIG Trust Fund to

their respective chief executive officers, defendant Kearse, Fassett and Hull during the periods of their trusteeship.

13. Defendant Yonkers CAP withdrew as a participating employer of CAAIG as of June 30, 1998.

14. At the time that Yonkers CAP withdrew as a participating employer of CAAIG, it was indebted to CAAIG in the amount of $107,496 plus interest for unpaid contributions previously billed by and due and owing to CAAIG.

### III.  <u>THIS PROCEEDING</u>

This is a class action brought against the three not-for-profit organizations that were formerly participants in CAAIG.  These organizations are the defendants: the EOC Nassau, the EOC Suffolk and Yonkers CAP.  Also joined in this action as a defendant was John L. Kearse a Trustee and Administrator of CAAIG and former Chief Executive Officer of EOC Nassau.   Mr. Kearse passed away on February 21, 2007 and is now represented in this action by Stella B. Kearse as Representative of the Estate of John L. Kearse, Deceased.  The thrust of the plaintiffs' claims in the present case are that not only did the defendants fail to return reserves attributable to plaintiffs, but they used that money to pay the claims of the employees of the defendant agencies and, also to pay certain other CAAIG administrative expenses and for other improper purposes, constituting fiduciary violations.

Plaintiffs' counsel, Alexander A. Miuccio, Esq., explained the nature of the second proceeding in his own words:

And that's what I thought the monies were, retained - - not spent, not disbursed, retained - - because I did not have, and neither did the plaintiffs have, any information along those lines.

And if I may, my wherefore clause and my relief requested a constructive trust on the monies which we were under the impression were retained by the CAAIG fund. Again, no knowledge at that point. I can't point to any actual knowledge, which is what is necessary, that before 1993 the plaintiffs knew that the monies were being used to pay expenses of the other employees.

* * * *

Diverted. Not spent or used, diverted, taken away, or whatever. At the time the lawsuit was commenced.

There is nothing in there about actual knowledge, that I knew about it, he couldn't have known about it. But yes, he thought it was diverted, but not to be used. Diverted and put away.

* * * *

The complaint in this action is after the plaintiff discovered that the money was actually used for purposes other than the exclusive benefit of Long Island Head Start's employees it started suit, and the allegations reflect that. As a matter of fact, in the wherefore clause one of the remedies is we asked for constructive trust on the monies that were in the CAAIG reserves that were allocable to Long Island Head Start.

Tr. at 914-915 and 948.[*]

At the conclusion of the trial, it was requested by counsel and agreed to by the Court that, initially, there would be a bifurcation of issues and post-trial briefs, and that counsel would brief and the Court would first decide the following three issues:

    1. The plaintiffs' Rule 15(b) motion to amend the complaint and/or to

---

[*] Tr. Refers to the trial transcript.

conform the pleadings to the proof with regard to six "new" issues or causes of action;

 2. The defense of the statute of limitations; and

 3. The issue of collateral estoppel.

### A) <u>The Motion to Amend the Complaint<br>and/or to Conform the Pleadings to the Proof</u>

The plaintiffs' amended complaint sets forth numerous claims alleging that the defendants breached their fiduciary duties imposed on them by ERISA 29 U.S.C. § 1001, *et seq.* The amended complaint also alleges claims for breach of the CAAIG Trust Agreement and unjust enrichment. In addition, the amended complaint sets forth claims of L.I. Head Start as a judgment creditor under the judgment entered in the prior class action on May 15, 2000 against CAAIG, Kearse and Alfonso Anderson, a CAAIG Trustee designated by EOC Suffolk.

The amended complaint sets forth eleven claims by the plaintiff L.I. Head Start against the defendants EOC Nassau, EOC Suffolk and Yonkers CAP; ten claims by the plaintiff Paul Adams ("Adams") against the defendants EOC Nassau, EOC Suffolk and Yonkers CAP; two claims by the plaintiffs as judgment creditors against the defendants EOC Nassau, EOC Suffolk and Yonkers CAP; six claims by the plaintiff L.I. Head Start against the defendant Kearse; six claims by the plaintiff Adams against the defendant Kearse; and one claim by both plaintiffs as judgment creditors against the defendant Kearse.

In addition, the plaintiffs made a motion to amend the complaint and/or to

conform the pleadings to the proof with regard to six additional alleged "prohibited transactions" amounting to violations under ERISA § 406, 29 U.S.C. § 1106, as follows:

1. The pledge of CAAIG plan assets to CEDC, an affiliated credit union entity controlled by EOC Nassau, for use as collateral for a loan by CEDC to EOC Nassau.

2. The loan of $36,000 of CAAIG plan assets to EOC Nassau.

3. The failure to collect delinquent employer contributions from EOC Suffolk, which the plaintiffs allege constitutes a lending of money or extension of credit to a party-in-interest.

4. The CAAIG payments of travel expenses to George Grayback, a fiduciary and party-in-interest who is not a employee of CAAIG.

5. The CAAIG payments of health and welfare claims for George Grayback and Nola Grayback who are not participants or beneficiaries under the CAAIG plan.

6. The CAAIG payments of excessive administrative fees in the form of bonuses to Profile Commercial Corp., a fiduciary and party-in-interest.

A review of Rule 15 of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.") reveals that, in 2007, there was an amendment of the Rule regarding "Amendments During and After Trial." As of 2006, the pertinent portion of Rule 15(b) provided:

**(b) Amendments to Conform to the Evidence**
When issues not raised by the pleadings are tried by express
or implied consent of the parties, they shall be treated in all respects as
if they had been raised in the pleadings. Such amendment of the
pleadings as may be necessary to cause them to conform to the
evidence and to raise these issues may be made upon motion of any

party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.  If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to a satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits.  The court may grant a continuance to enable the objecting party to meet such evidence.

In 2007, Rule 15(b) was amended to read as follows:

(**b**) **Amendments During and After Trial**.

(1) **Based on an Objection at Trial**.  If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended.  The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits.  The court may grant a continuance to enable the objecting party to meet the evidence.

(2) **For Issues Tried by Consent**. When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move – at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.  But failure to amend does not affect the result of the trial of that issue.

Notwithstanding the 2007 amendment to Rule 15(b), the prior cases interpreting this rule are valid and binding.  The Advisory Committee Notes with regard to the 2007 amendment to Rule 15(b) states that: "The language of Rule 15 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules.  These changes are intended to be stylistic only."

The decision as to whether to allow such an amendment is left to the discretion of the district court judge. *See Fisher v. Vassar College*, 70 F.3d 1420, 1449 (2d Cir. 1995); *Grand Light Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672, 680 (2d Cir. 1985). However, when such a motion is made after the start of the trial, it should be granted only if the party against whom the amendment is offered will not be prejudiced by the amendment. *Hillburn by Hillburn v. Maher*, 795 F.2d 252, 264 (2d Cir. 1986) *cert. den.* 479 U.S. 1046 (1987). In determining whether to allow an amendment pursuant to Rule 15(b), the Second Circuit has advised that the questions to be answered are as follows:

1. Whether the new issues were tried with the parties' express or implied consent,

2. Whether the party against whom the amendment is offered will be prejudiced by the amendment,

3. Whether the party against whom the amendment is offered had a fair opportunity to defend, and

4. As is relevant in this case, whether the party against whom the amendment is offered, had an opportunity for an adjournment to offer additional evidence on the matter at issue.

*U.S. v. Certain Real Property*, 945 F.2d 1252, 1257 (2d Cir. 1991).

With respect to the issue of consent, "usually consent may be implied from the failure to object at trial to the introduction of evidence relevant to the unpled issue."

*Id.; Luria Bros. & Co. v. Alliance Assurance Co.*, 780 F.2d 1082, 1089 (2d Cir. 1986). However, consent must be based on whether the non-moving party recognized that the matter at issue had entered the case on trial. (6A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 1493, at 462 (3d ed. 1998).

In his post-trial brief, the defendant Kearse opposes the plaintiffs' motion to amend the complaint or to conform the pleadings to the proof. Counsel for Kearse raises the following points: First, that the defendants will suffer prejudice because they are "disadvantaged . . . from presenting their case . . . and did not have an opportunity to fully litigate the very factual allegations and legal contentions that plaintiffs now seek to add to their pleadings as amendments." (Kearse Brief p. 22). In particular, counsel complains that the plaintiffs presented three new factual allegations and alleged ERISA violations after the plaintiffs rested and during the defendants' case. As a result, counsel complains that he "did not have the opportunity to structure defendant Kearse's direct examination testimony – or that (sic) direct examination testimony of defendants' prior witnesses – in accordance with the Plaintiff's allegation of defendant EOC Nassau's 'alleged pledge of CAAIG plan assets to CEDC.'" (Kearse Brief pp. 23-24). Counsel for Kearse also contends that the same prejudice is present with regard to the other amendments sought – namely, they are untimely and the defendants had no opportunity to defend.

Second, counsel for Kearse asserts that the defendants would be prejudiced by allowing the proposed amendments "because several witnesses that are crucial to

disproving said amendments are unavailable to defendants for depositions." (Kearse Brief at p. 24). For example, counsel points to the fact that George Grayback is deceased, and that his absence is clearly prejudicial to the defendants.

The Court finds that the defendants had a full and fair opportunity to defend against the plaintiffs' new causes except with regard to the two George Grayback issues. George Grayback is deceased and so had no opportunity to testify on his behalf or on behalf of the defendants. However, as to all the other "new" issues, there were many opportunities for the defendants to submit evidence on their behalf during this very extended bench trial.

The Court notes that the trial proceedings in this case started on July 26, 2004, at which time a discussion was held with regard to the collateral estoppel effect of the issues decided at the first trial. At that time, plaintiffs' counsel raised the question of "where did the one million dollars go?" He indicated that he can show it was distributed prior to March 3, 2000.

The next session was on July 29, 2004 at which time, counsel for the plaintiffs stated that the Fund paid benefits to the Yonkers CAP employees for years after its default, which constituted a loan or extension of credit prohibited by ERISA. This is one of the pleaded subjects, and certainly, the defendants had a full and fair opportunity to defend as to this issue. This was prior to any testimony taken during the trial.

The bench trial of this case actually commenced on October 8, 2004 with

opening statements. We learned that EOC Suffolk withdrew from CAAIG in June, 1998 and, apparently, CAAIG itself had terminated its activities in May, 1998. During his opening statement, counsel for the plaintiffs raised three alleged pleaded ERISA violations. First, that CAAIG diverted monies belonging to L.I. Head Start by paying benefits for the employees of the other three agencies. Second, that all three agencies and Kearse loaned money to Yonkers CAP, constituting an unlawful extension of credit. Third, there was no effort by the three agencies to cover the expenses of CAAIG. Counsel for the plaintiffs considered these three alleged violations as prohibited transactions. At that time, defense counsel raised the statute of limitations defense and Attorney Miuccio's knowledge, which issues the Court will later address.

The trial continued on November 19, 2004, December 3, 2004, December 14, 2004, December 15, 2004, December 16, 2004 and December 17, 2004 in the plaintiffs' case with witness Anthony Macaluso, essentially dealing with what happened to the reserve funds delineated by the Court in the first decision, together with the introduction of exhibits and depositions by plaintiffs' counsel. On May 27, 2005, after depositions of Sabana Prasad, the Director of Finance of EOC Nassau and that of Kearse were introduced and additional exhibits were offered, the plaintiffs rested. At that time, counsel for the defendants moved for judgment as a matter of law, and again raised the defense of the statute of limitations. The Court reserved decision on the defendants' motions at the end of the plaintiffs' case.

The trial proceeded with the defendants' case on August 12, 2005. William Rowley, Vice President of Profile Commercial Corp. ("Profile"), testified that Profile was employed by CAAIG to review the insurance program and obtain quotes from competing insurance companies, among other duties. In his endeavors Rowley dealt with George Grayback. On September 22, 1986, Rowley recommended that CAAIG revolve from an insured to a self-insured plan and his recommendation was adopted. Profile was the Administrator of the self-insured CAAIG Plan.

The trial continued on September 9, 2005 with Rowley on the stand. During this session, for the first time, the plaintiffs' sixth additional claim emerged, namely, alleged excessive administrative fees to Profile. For the year ending August 31, 1991, Profile received administrative fees of $155,500 (Pls. Ex. 61). For the year ending August 31, 1993, Profile received administrative fees of $161,500 (Pls. Ex. 64) and fees of $141,700 for the year ending August 31, 1996 (Pls Ex. 67). So that this issue was raised by the plaintiffs – even though in the defendants' case – on September 9, 2005; through the defendants own witness on the stand. That certainly provided the defendants with an opportunity to defend as the trial continued to October 20, 2006, some 13 months later.

At the same trial session, September 9, 2005, the subject of George Grayback was discussed. Apparently, George Grayback was affiliated as an independent contractor employed by Profile and both he and his wife were involved with CAAIG. Both of them did receive benefits even though not participants in CAAIG. Thus, the

fifth "new" issue asserted by the plaintiffs emerged during the trial on September 9, 2005.

This extended trial continued on December 27, 2005. At that time, it was revealed that medical claims for George and Nola Grayback were paid by CAAIG even though coverage was restricted to full-time employees of the participating agencies. Also, in this session, it was revealed that Profile received bonuses from CAAIG of $20,000 per year for seven years, in addition to its fee of $11,791.67 every month. In addition, it was revealed that for the year ending August 31, 1989, Profile was paid $134,000 in addition to a bonus of $20,000 for a total fee of $154,000. Also, during the testimony of Kearse, he revealed that Grayback was charging the Fund $1,000 per month for travel expenses. In one worksheet for the year ending August 31, 1990, Grayback's travel expenses from his home in New Jersey was the sum of $9,000, the basis for the plaintiffs' fourth "new" issue. It was conceded by Kearse that Grayback was not an eligible employee insofar as benefits are concerned. Payments made on behalf of the Graybacks were $8,966.43 between 1985 and 1989, and, an additional sum of approximately $6,000 in the period from 1990 to 1992 for a total of about $15,000. However, at this point it was also revealed that Grayback was deceased (Tr. at 1295). Obviously, Grayback cannot dispute any of the allegations against him. Therefore, the Court finds that the defendants <u>are</u> prejudiced and unable to fully defend with regard to the Grayback issues. Accordingly, with regard to the plaintiffs' "new" issues four and five as to the Graybacks, their motion to amend

and/or conform the pleadings to the proof is denied.

In the June 2, 2006 trial session, the first new cause, the CEDC loan issue was initially discussed at the trial. It seems that EOC Nassau sponsored the Community Economic Development Corp. ("CEDC"). This organization encourages minority businesses and activities in impoverished areas, including furnishing financing and counsel. Kearse was the CEO of CEDC for twenty years to 1992. CAAIG funds were on deposit with CEDC Federal Credit Union. Kearse denied that any CAAIG funds were used as collateral for a loan to CEDC for the CEDC Federal Credit Union. However, Kearse was a witness who fully testified concerning this issue, and the records were available, so that the defendants did have an opportunity to prepare and defend as to the CEDC "new" issue. The motion to conform and amend as to this first new cause involving the CEDC and the loan to EOC Nassau is granted.

The second "new" issue, the loan of $36,000 by a temporary successor to CAAIG called Community Action Agencies Insurance Trust ("CAAIT") to EOC Nassau arose in the July 28, 2006 trial session. Apparently, CAAIT made an interest free loan of $36,000 to EOC Nassau, as evidenced by a letter dated February 25, 1987 (Pls. Ex. 44), signed by Kearse. Kearse testified that the loan was repaid. As to this second "new" issue, brought up on July 28, 2006, with principal witness Kearse on the stand, notwithstanding the fact that it first emerged in the defendants' case, there was an opportunity to defend on the part of the defendants. The motion to conform and amend as to this second new issue, the loan of $36,000 to EOC Nassau, is

granted.

The next trial session occurred on August 7, 2006, with Kearse still on the stand. Interestingly, at this time it was revealed that Kearse had been deposed by plaintiffs' counsel ten or eleven times starting in 1995. During those depositions, he was questioned about the bonuses paid to Profile; the $36,000 loan to EOC Nassau; the payments to Grayback; and the pledge of CAAIG assets to CEDC, for use as collateral on a loan by CEDC to EOC Nassau. All of these facts were made known to plaintiffs' counsel in the Kearse depositions of 1995 and 1996.

Kearse also explained that Grayback, an experienced insurance expert, was brought in to CAAIG by Profile to perform regular duties at the EOC Nassau facility. He worked three days a week and he performed the day-to-day administrative duties to effectuate the CAAIG Plan so that it was responsive to participants providing health benefits, life insurance and long term disability. Grayback received and reviewed the claims and arranged for payments, including drawing the checks. As Kearse stated, Grayback's primary obligation was to "help the best interests of the participants."

In late 1989 or early 1990, it became apparent that Yonkers CAP was in arrears in the sum of approximately $100,000. After an initial decision to terminate Yonkers CAP, the trustees of CAAIG made a decision to re-admit that organization in August 1992, even though CAAIG could not recover the arrears. Yonkers CAP could not repay the arrears due and owing, if it was going to be able to continue its

beneficial program for the underprivileged.  The Trustees' meeting minutes of December 14, 1993, shows that it was decided to "write off the Yonkers CAP arrears."  Both Yonkers CAP and Suffolk EOC withdrew from CAAIG on June 30, 1998.  Ultimately, in September 1998, Kearse was barred from being a trustee in an ERISA Fund, by way of a consent decree.  At that time, CAAIG no longer existed.

In the second round of testimony by Anthony Macaluso, he stated that Attorney Miuccio first represented L.I. Head Start in the 1992-1993 time frame. When questioned about the "new" causes, Macaluso had no recollection of payments to George and Nola Grayback.  He disclaimed knowledge of bonuses to Profile and knew that CAAIG had deposits in the CEDC.  However, he was not aware of a loan by CEDC collateralized by CAAIG funds.  Also, Macaluso was aware of the premium monies owed by Yonkers CAP, and the decision on March 3, 1992 to permit Yonkers to rejoin CAAIG, notwithstanding the failure to repay the premiums.

Based on the above review of the testimony, the Court finds that, as a result of the length of this trial from October 8, 2004 to September 14, 2007, a  period of almost three years, during which there were 21 separate trial sessions, the defendants were not prejudiced by the introduction of the new issues, except as to issues four and five involving George Grayback and Nola Grayback.  *See Quarantino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir.1995) ("Leave is normally granted, especially when the opposing party is not prejudiced by the supplemental pleading").

With regard to any documentary evidence, on May 12, 2006, plaintiffs'

counsel was directed to produce all the documents to defendants' counsel regarding the alleged non-pleaded violations (Tr. at 1835). Thereafter, thirty-seven documents were delivered to defendants' counsel. The Court finds that, with regard to the four "new issues" stated above, the defendants had a full and fair opportunity to defend and to call witnesses in regard to these issues.

Accordingly the Court grants the motion by the plaintiffs to conform the pleadings to the proof and amend the complaint to add the following four "new" issues constituting separate alleged breaches of fiduciary duty:

1. The pledge of CAAIG plan assets to CEDC, an affiliated credit union entity controlled by EOC Nassau, for use as collateral for a loan by CEDC to EOC Nassau.

2. The loan of $36,000 of CAAIG plan assets to EOC Nassau.

3. The failure to collect delinquent employer contributions from EOC Suffolk, which the plaintiffs allege constitutes a lending of money or extension of credit to a party-in-interest.

4. The CAAIG payment of excessive administrative fees in the form of bonuses to Profile Commercial Corp., a fiduciary and party-in-interest.

### B) <u>The Defense of the Statute of Limitations</u>

The defendants have moved pursuant to Fed.R.Civ.P.52(c) for judgment as a matter of law based on the defense of the statute of limitations as to all the pleaded and non pleaded causes of action. In a bench trial, under Rule 52(c), the district judge, after hearing all the evidence with respect to particular issues – in this case, the

motion to amend the complaint and the statute of limitations – may make findings of fact and enter judgment as a matter of law on those issues. *See Fillmore v. Page*, 358 F.3d 496, 502 (7th Cir. 2004); *Northeast Drilling, Inc. V. Inner Space Services, Inc.*, 243, F.3d 25, 35 (1st Cir. 2001).

In this case, the primary issue raised by the defendants is the question of whether the plaintiffs claims are barred by the applicable statute of limitations. ERISA provides an express statute of limitation for actions arising from a breach of fiduciary duty or any other violation of ERISA's fiduciary and prohibited transactions provisions. 29 U.S.C. § 1113 provides:

### § 1113. Limitation of actions

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of –

(1) six years after (A) the date of the last action which constituted a part of, or the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

An explanation of the differences between the three and six-year limitation period is required. The statute is clear that actual knowledge of the breach of fiduciary duty is required before the three-year limitation period begins to run. In

effect, this three-year statute of limitation requiring proof of "actual knowledge" operates as an exception to the otherwise controlling six-year time period.

An excellent discussion of the reasons for a statute of limitation and the rules in an ERISA case is set forth in *Carey v. International Brotherhood of Electrical Workers*, 201 F.3d 44 (2d Cir. 1999). In *Carey,* the Second Circuit noted the reasoning by the Supreme Court in *Johnson v. Railway Express Agency, Inc.* 421 U.S. 454, 463-64, 95 S.Ct. 1716, 44 L.Ed 2d 295 (1975), which stated that the length of a limitation period in federal court "inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valuable claims are outweighed by the interests in prohibiting the prosecution of stale ones." In *Carey*, the basis for the statute of limitations rules was stated:

> Statutes of limitation serve several important policies, including rapid resolution of disputes, repose for those against whom a claim could be brought, and avoidance of litigation involving lost evidence or distorted testimony of witnesses. *See, e.g., Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). For these reasons, statutes of limitation "are not to be disregarded by courts out of a vague sympathy for particular litigants." *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 152, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (per curiam). Indeed, strict adherence to limitation periods "is the best guarantee of evenhanded administration of the law." *Mohasco Corp. v. Silver*, 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980).

*Carey*, 201 F.3d at 47.

1. **As to "Actual Knowledge"**

A plaintiff can be considered to have actual knowledge of a breach of fiduciary duty when he or she has knowledge of all the material facts necessary to understand that a fiduciary has breached such a duty or otherwise violated the Act. *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001). The statute is clear that actual knowledge of the breach by the fiduciary is required before the three-year limitation period will apply. Constructive knowledge is insufficient to satisfy the actual knowledge requirement. The rule, in this regard, was stated in *New York State Teamsters, et al., v. Estate of Rocco F. DePerno*, 816 F. Supp. 138, 143-44 (N.D.N.Y. 1993), as follows:

> The Statute is clear that actual knowledge of the fiduciary breach is required before the three year limitation period begins to run. "[T]he key to the ERISA statute of limitations . . . is 'actual knowledge' of the ERISA breach or violation." *Ziegler v. Connecticut General Life Ins. Co.*, 916 F.2d 548, 552 (9th Cir. 1990). "ERISA requires actual knowledge of all the elements of the violation alleged here." *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1176 (3d Cir. 1992). The three year statute of limitations is an exception to the six year time period. "The six year time period reflects Congress' determination to impress upon those vested with control of pension funds the importance of the trust they hold. Thus, Congress evidently did not desire that those who violate the trust could easily find refuge in a time bar." *Brock v. Nellis*, 809 F.2d 753, 754 (11th Cir.), *cert. dismissed*, 483 U.S. 1057, 108 S.Ct. 33, 97 L.Ed.2d 821 (1987).
>
> "[A] plaintiff may have constructive knowledge of a breach before he actually knows of the breach, but section 1113 calls for actual knowledge." *Gluck*, 960 F.2d at 1176; *see also Rogers v. Millan*, 902 F.2d 34 (6th Cir. 1990), *reported in full,* No. 89-3707, 1990 WL 61120, 1990 U.S.App. LEXIS 7607 (6th Cir. 1990) (noting that constructive knowledge of an ERISA violation is insufficient to invoke the actual knowledge exception); *Radiology Center, S.C. v. Stifel, Nicolaus &*

*Co.*, 919 F.2d 1216, 1222 (7th Cir. 1990) (three year statute of limitation "speaks solely in terms of *actual*, not constructive, knowledge."); *Brock*, 809 F.2d at 764-55 (the three year provision in § 1113 does not incorporate the theory of constructive knowledge).

While a plaintiff need not have knowledge of the relevant law, *Blanton v. Anzalone*, 760 F.2d 989, 992 (9th Cir. 1985), he or she must have knowledge of all facts necessary to constitute a claim. *See also Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1086 (7th Cir. 1992) ("The relevant knowledge for triggering the statute of limitations is knowledge of the facts or transaction that constituted the alleged violation. Consequently, it is not necessary for a potential plaintiff to have knowledge of every last detail of a transaction or knowledge of its illegality.").

However, as stated above, there must be actual knowledge, not "speculation that something is awry, but specific knowledge of the actual breach of duty upon which (plaintiff) later sues." *Mason Tenders District Counsel Pension Fund v. Massera,* 958 F. Supp. 869, 882 (S.D.N.Y. 1997); quoting *Benvenuto v. Taubman*, 690 F. Supp. 149, 153 (E.D.N.Y. 1988). *See also Brock v. Nellis,* 809 F.2d 753, 755 (11th Cir. 1987).

2. **Actual Knowledge" - Should it be Imputed from an Attorney to Clients?**

The Supreme Court commented on the knowledge imparted to a party's counsel in *Link v. Wabash R.R. Co.*, 370 U.S. 626, 634, 82 S.Ct. 1386, 1390, L.Ed. 734 (1962) ("[In] our system of representative litigation, . . . each party is . . .

considered to have notice of all facts, notice of which can be charged upon the

attorney").  In *Burns v. Imagine Films Entertainment, Inc.,* 165 F.R.D. 381

(W.D.N.Y. 1996), the court ruled that agency/principal law applies to the attorney-

client relationship, and that any knowledge acquired by counsel is imputed to

plaintiffs at the time that their counsel receives said information – regardless as to

when counsel reads such information or makes any decisions based on same.  The

*Burns* court rejected a party's argument that they should be permitted to raise a late

affirmative defense after a four-year delay, based on their attorneys' failure to apprise

them properly.  The Court held such delay by counsel to be fatal to the client's efforts

to assert such affirmative defense, holding:

> Either is an insufficient reason to excuse a four year delay in asserting
> any new affirmative defenses based on these agreements.  *See Veal v.
> Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) (the <u>relationship between an
> attorney and the client he or she represents in a lawsuit is one of agent
> and principal, thus the client "has notice of a fact if his agent has
> knowledge of the fact, reason to know it or should know it...")</u> (citing
> Restatement (Second) of Agency §9(3) (1958; emphasis added).  *See
> also Celestine v. Veteran's Administration Hospital*, 764 F.2d 1360,
> 1362 (8th Cir. 1984) ("<u>It is fair to assume, in most contexts, that
> lawyers know what their clients know. . .</u>");  *Chira v. Lockheed
> Aircraft Corp.,* 634 F.2d 664, 666 (2d Cir. 1980) (petitioner cannot
> avoid the consequences of the acts or omissions of his chosen
> representative, absent a truly extraordinary situation, as "[a]ny other
> notion would be wholly inconsistent with our system of representative
> litigation, in which each party ... is considered to have 'notice of all
> facts, notice of which can be charged upon the attorney.'" (quoting
> *Smith v. Ayer*, 101 U.S. 320, 326, 25 L.Ed.955 (1980)); *New York State
> Energy Research & Development Authority v. Nuclear Fuel Services,
> Inc.*, 714 F. Supp. 71, 73 (W.D.N.Y. 1989) ("a 'client is not excused
> from the consequences of his attorney's nonfeasance.'  The client
> must be, consistent with our system of representative litigation,
> charged with notice of all facts within the possession of his attorney.

It follows that 'principal counsel' is chargeable with the knowledge of local counsel, because the latter especially is true of the former.") (quoting *Chira v. Lockheed Aircraft Corp.,* 634 F.2d 664, 666 (2d Cir. 1980). (emphasis added).

*Burns,* 165 F.R.D. at 390. *See also United States v. International Brotherhood of Teamsters*, 986 F.2d 15, 20 (2d Cir. 1993) (citing Restatement of the Law Governing Lawyers ch.2, Introductory Note); *Chira*, 634 F.2d at 666 ("[e]ach party . . . is considered to have 'notice of all facts, notice of which can be charged upon the attorney'"); *New York State Energy Research & Development Authority v. Nuclear Fuel Services, Inc.*, 714 F. Supp. at 73 ("The client must be . . . charged with notice of all facts within the possession of his attorney.").

This lawsuit was commenced on December 13, 2000.  In this trial, substantial evidence was adduced that the plaintiffs' sole witness, Anthony Macaluso, L.I. Head Start's Director of Finance, was present at depositions at which the alleged "diversion" of L. I. Head Start Funds was revealed.  These depositions took place more than three years prior to the commencement of  this action.  Also, there was evidence introduced during the trial that strongly indicated that attorney Miuccio and Director of Finance Macaluso had actual knowledge of the alleged "diversion" by CAAIG of  L.I. Head Start funds more than three years prior to the commencement of this action.

### 3. **As to the "Actual Knowledge" of Plaintiffs' Counsel in this Class Action Case**

Significantly, Attorney Miuccio appears to tacitly admit such knowledge on

his part as to the diversions, the $36,000 loan to EOC Nassau and the failure to collect

contributions from EOC Suffolk.  He stated that he is relying on these "diversions" to

demonstrate a pattern of improprieties, rather than to establish independent claims

that the defendants breached their fiduciary obligations.  In this regard, Attorney

Miuccio stated the following on the record:

> MR. MIUCCIO:  Maybe we can avoid a lot of work on all sides.
>
> The issues with respect to the various alleged fiduciary violations that I just asserted, your Honor, were certainly known to me in discovery in the prior action.  I want to make that clear for the record, your Honor.
>
> MR. GOIDELL:  I asked you to stipulate to that two months ago.
>
> MR. MIUCCIO:  Let me make my point.
>
> I said this, and the transcripts will bear me out on more than one occasion, the reason why I brought up the fiduciary violations along the lines I asserted this afternoon is to show that there was a pattern among the trustees to benefit their respective agencies.
>
> And even if there is a statute of limitations applicable, and I believe there is a statute of  limitations with respect to what was discovered in the prior action.  I concede that, your Honor.
>
> I am saying, and I mentioned it throughout the trial, I'm trying to show a pattern on behalf of the defendants so that when your Honor rules, you have a background as to how this fund has been managed by the defendants and by the defendants I mean –
>
>    * * * *
>
> THE COURT: Let me understand.

Are you conceding, for the purpose of the defense of the statute of limitations, that the issues were known to you in the prior action, all these issues, as to the CEDC, Yonkers CAP, as to the Profile, and as to the other one involving the names I can't remember.

MR. MIUCCIO: Grayback.

THE COURT: You're conceding that you knew that in the prior action?

MR. MIUCCIO: I concede that I knew that.

THE COURT: You, meaning the plaintiffs?

MR. MIUCCIO: Yes, your Honor.

THE COURT: Okay.

MR. MIUCCIO: <u>I knew of it, and I can assure you my clients didn't know about it. None of the class members would know about it.</u> I knew about it because I got it in discovery. I'm willing to concede that, your Honor.

THE COURT: You're conceding you knew, but not the plaintiffs?

Tr. at 2267-2268 (emphasis supplied).

This concession of actual knowledge on the part of Attorney Miuccio was confirmed in his Reply Brief, where it was stated:

Counsel Miuccio conceded his actual knowledge for purposes of the statute of limitations of the material facts that gave rise to the unpleaded claims and related issues. He informed the Court that the facts supporting these new claims were made known to him during discovery proceedings in the prior actions (Tr. 2150-2151). During argument of the Rule 15(b) motion, he distinguished between the pleaded claims and the new claims that is the subject to plaintiffs' Rule 15(b) motion (Tr. 2142) and made his concession only with respect to the unpleaded claims, not the claims pleaded in the instant complaint (Reply Brief at 22).

29

However, Attorney Miuccio made clear that "he was not conceding that the class members had actual knowledge of the defendants' breaches of fiduciary duty regarding the new claims." (Reply Brief at 23).

During the trial, the issue was raised as to whether the actual knowledge of the facts underlining the plaintiffs' causes, by the plaintiffs' attorney, Alexander A. Miuccio, can be imputed to his clients. As stated above, in general, under the law of agency, an agent's knowledge is imputed to his principal, when that knowledge is material to the subject matter of the agency. *See e.g., Weiss v. Siusse, et al.* 381 F. Supp. 2d 334, 339 (S.D.N.Y. 2005) ("Knowledge by an agent is sufficient to start the limitation period running on a claim held by the agent's principal."); s*ee also*, Restatement (Second) of Agency, §§ 9(3), 268, 272 and 275. ("The relationship between an attorney and the client he or she represents in a lawsuit is one of agent and principal.") In *Veal v. Geraci*, 23 F.3d at 722, 725 (2d Cir. 1994), the law with regard to the attorney-client agency vis-a-vis the statute of limitations was clearly set forth:

> In general, when an agent is employed to represent a principal with respect to a given matter and acquire knowledge material to that representation for purposes of assessing the principal's rights and liabilities vis-a-vis a third person the agent's knowledge is imputed to the principal. *See generally Restatement (Second) of Agency* §§ 9(3), 268, 272, 275 (1958). Though perhaps most often relevant in assessing a principal's liability, *see id.* § 9(3) comment *h*, §§ 268, 272, 275, this rule has general application:
>
> A person has notice of a fact, if his agent has knowledge of the fact, reason to know it, or should know it, or has been given a notification of it, under circumstances coming within the rules applying to the liability of a principal because of notice to his agent.

          \*    \*    \*    \*

The relationship between an attorney and the client he or she represents in a lawsuit is one of agent and principal. *See, e.g., United States v. International Brotherhood of Teamsters*, 986 F.2d 15, 20 (2d Cir. 1993) (citing *Restatement of the Law Governing Lawyers* ch. 2, Introductory Note (Tent. Draft No. 5, 1992)).

          \*    \*    \*    \*

Thus, whether or not Veal himself heard Geraci's testimony, Veal's attorney plainly had knowledge of the conduct giving rise to Veal's present claim, and under traditional principles of agency the attorney's knowledge must be imputed to Veal.

*Id.*

The record is replete with evidence of the actual knowledge of Attorney Miuccio. During discovery in the prior action, the defendants sent plaintiffs' counsel numerous documents which contributed to his "actual knowledge" of both the alleged pleaded and the non-pleaded violations. Attorney Allen Breslow, Esq. testified that in 1993, he served as defense counsel in the plaintiffs' prior ERISA action against the CAAIG defendants. In addition, Breslow served as counsel in related subsequent actions, including a lawsuit against his firm, where the same plaintiffs, L.I. Head Start and Adams were represented by the same counsel, Alexander A. Miuccio, Esq., for about thirteen years of litigation. Breslow testified as a witness in the present case.

Attorney Breslow also testified that in these actions Attorney Miuccio demanded and received numerous documents from CAAIG and EOC Nassau between 1993 and 1996. Also, he had discussions with plaintiffs' counsel with regard to the monies owed by Yonkers CAP in 1993 and 1994. Attorney Miuccio conceded that he

received all these documents in those years. Further, in a deposition on January 19, 1996, the George and Nola Grayback records from 1990, 1991 and 1992 were revealed. In addition, a letter from Breslow to Miuccio, dated July 7, 1995 (Pls. Ex. 76), discussed (1) four bonuses paid to Profile; (2) enrollment cards sent to Grayback for years 1994 and 1995; and (3) additional data on Profile. Also, a January 11, 1993 letter with regard to the CEDC situation was delivered to Miuccio in early 1995. In addition, in multiple depositions of Kearse between January 1995 and January 1996, which Miuccio conducted, the following matters were discussed: (1) the claims regarding Grayback; (2) the bonuses to Profile; (3) the CEDC situation; and (4) the delinquency of EOC Nassau. Also admitted in evidence is an April 25, 1995 letter from Breslow to Miuccio referring to bonuses paid to Profile in the sum of $40,000 (Dfts. Ex. AW).

On September 22, 2006, during this trial, the Court issued a ruling from the bench holding that the plaintiffs' counsel's knowledge in this case was not imputed to the plaintiffs. That ruling was based on *Schwab v. Phillip Morris USA,* No. 04 CV 1945 2005 WL 2467766 (E.D.N.Y. Oct 6, 2005) where such knowledge was not imputed in a class action lawsuit. A closer look at *Schwab* and other class action cases leads the Court to confirm its prior ruling and hold that Miuccio's knowledge <u>is</u> <u>not</u> imputed to the class action plaintiffs in this case.

In *Schwab,* Judge Weinstein held that without discovery it was premature to determine whether counsel's knowledge – derived from his representation of a class

comprised of plaintiffs apparently numbering in the tens of millions, should be imputed to the *Schwab* plaintiffs.  *Id.*

> In  *Schwab*, Judge Weinstein stated:
>
> In some cases it is appropriate for an attorney's knowledge to be imputed to the client, particularly where there is a single attorney and a single known client in an ongoing relationship.  That is not the situation now presented.  In the instant case defendants seek to impute the knowledge of counsel to a class of unidentified plaintiffs numbering in the tens of millions who claim they were defrauded for decades.  Principles of agency applicable in the single-attorney single-client relationship cannot be transposed into the class action context under present circumstances.

*Id.* at 3.

In this case, Attorney Miuccio conceded that he had knowledge of the alleged ERISA violations by these defendants.  Also, Miuccio conceded that he obtained this information when he represented the same class plaintiffs in the prior 1993 ERISA action. However, the situation in this class action case is somewhat unique.  It is a class action, but with 77 plaintiffs and not the millions as in the *Schwab* case.  Should the same principle involving a class action as in *Schwab* govern the facts in this class action case?  Research on this subject reveals few cases, but the basic principle appears to remain the same, namely that, in a class action case knowledge of the plaintiffs' counsel is not imputed to the plaintiffs in the class.

In *Stieberger v. Sullivan*, 738 F. Supp. 716 (S.D.N.Y. 1990), a class of social security claimants and the City of New York brought a class action challenging a policy of the Social Security Administration.  The issue of "actual knowledge" of

plaintiffs' counsel arose and was reviewed at length by Judge Sand:

> For reasons which will be discussed below, the Court does not believe that knowledge that can be ascribed to certain counsel is sufficient to bar the actions of the entire plaintiff class in this case. . . . Defendants have not offered any additional evidence suggesting that class members could reasonably have been expected to have familiarized themselves with Bellmon Review.
>
> The thrust of defendants' argument is that plaintiffs' counsel either knew or should have known of the facts which gave rise to plaintiffs' cause of action. Defendants point out that the various congressional hearings, media reports and legal actions raising these issues well before the filing of plaintiffs' complaint should have at least apprised counsel of the relevant facts.
>
> *        *        *        *
>
> This evidence would strongly suggest that some of plaintiffs' attorneys knew of the relevant facts well before May 30, 1984 and that many other attorneys could have known of them.
>
> What follows from this conclusion, however, is not clear. Defendants cite *Link v. Wabash R.R. Co.,* 370 U.S. 626, 634, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962) (quoting *Smith v. Ayer,* 1 01 U.S. 320, 326, 25 L.Ed. 955 (1880)), for the proposition that plaintiffs are charged with "'notice of all facts, notice of which can be charged upon the attorney.'" *See also Hay v. Wells Cargo, Inc.,* 596 F. Supp. 635, 640 (D. Nev.1984), *aff'd*, 796 F.2d 478 (9th Cir.1985) (counsel's knowledge, imputed to plaintiff, can foreclose equitable tolling of statute of limitations); *International Paper Co. v. Federal Power Comm'n,* 438 F.2d 1349, 1357 (2d Cir. 1971), *cert. denied,* 404 U.S. 827, 92 S.Ct. 61, 30 L.Ed.2d 56 (1971). Plaintiffs point out that each of the cases cited by defendants involved individual representation where plaintiffs had at least some discernible relationship with counsel and retained the option of commencing legal malpractice actions against their attorneys and did not involve a class action with thousands of dispersed parties. Plaintiffs also observe that class counsel in this case did not represent the class members prior to the commencement of this litigation.
>
> *        *        *        *

> The Court's decision would have unfortunate consequences whether or not we find the statute of limitations to have been tolled. If we imputed counsel's knowledge to the entire plaintiff class, thousands of members of the class, many of whom are disabled, indigent, and unsophisticated pro se litigants, would be denied relief to which they would otherwise be entitled and may desperately need. Furthermore, the vast majority of the class members have had no contact with counsel and may well be unaware that any action in which they have an interest is proceeding. At the same time, if counsel for a class is permitted to ignore limitations provisions like Section 405(g), there is a danger that the salutary purposes of a statue of limitations may be significantly undermined in class actions.

738 F. Supp. at 726-727.

In a case involving eight plaintiff trustees of a union, the same rule emerged. In *Crimi v. Pas Industries Inc.*, No. 93 CV 6394, 1995 WL 272580 (S.D.N.Y. May 9, 1995) the court declined to attribute knowledge of one trustee to any of the other trustees.

> Plaintiffs argue with supporting affidavits that none of the trustees, and certainly not a majority of the trustees or the entire board itself, had actual knowledge of the facts to each claim, and therefore the six year period is appropriate. Under a six year period, all three claims would be indisputable timely.

> \* \* \* \* \* \*

> Most consonant with the language of the statute and the purposes of ERISA is the interpretation that any trustee who sues as plaintiff and does not have actual knowledge of the relevant facts sufficient to make an ERISA claim may avail himself of the six year limitations period. In the context of what constitutes knowledge, courts have construed the "actual knowledge" provision narrowly. *See Gluck v. Unisys Corp.*, 960 F.2d 1168, 1176 (3d Cir. 1992).

> \* \* \* \* \* \*

Because the enforcement statute allows any fiduciary to sue, it would be inconsistent to provide a shorter limitations period for a plaintiff trustee due to the actual knowledge of another trustee, whether or not a co-plaintiff.

* * * * * *

Since it is not apparent that each trustee had knowledge of the facts sufficient for him to bring a claim prior to September 1990, the claims may not be dismissed now as being time-barred.

This issue of "actual knowledge" by plaintiffs' counsel Miuccio in this case is a close call. On the one hand there is the enunciated law that, generally, the "actual knowledge" of plaintiffs' counsel in a class action of numerous members will not be imputed to the individual class members. On the other hand, here we have a relatively small class action consisting of 77 members. Should the same rule apply to them, as is available to a class action numbering in the thousands? When the basic reason for the rule is analyzed, the answer to that question is "Yes." It would be unfair not to apply the rule in this case. The plaintiff class members are involved in a not-for-profit organization, designed to assist and support persons of limited financial ability. There is no evidence in this case that any of the 77 plaintiffs had any knowledge of the facts that would constitute any knowledge, no less actual knowledge, of any of the material facts.

The same principle of law which states that the "actual knowledge" of counsel for a large plaintiff class should not be imputed to the individual class members, should be applied in this case. Accordingly, the Court rules that the "actual knowledge" of plaintiffs' class action attorney, Alexander A. Miuccio, Esq., is not

imputed to the individual class action plaintiffs.  Therefore, as the plaintiffs' did not

have actual knowledge of the material facts giving rise to their causes of action, the

three year limitations period is inapplicable and the six year statute of limitations

applies.

### (4)  As to the Plaintiffs' "Continuing Violation" Contention

The plaintiffs contend that the statute of limitations on the "additional unpled

claims was prolonged under the 'continuing violation' theory".  (Reply Brief at 18).

The plaintiffs' "continuing violation" response to the defendants' statute of limitation

defense is summarized in the plaintiffs' reply brief, as follows:

> In sum, the series of ERISA fiduciary violations were a
> continuing breach giving rise "to a new cause of action each time the
> plan was injured." *[Buccino*, 578 F. Supp. At 1521].  Defendants had a
> continuing obligation under ERISA to act solely in the interest of the
> Funds' participants and beneficiaries and with the care, skill, prudence
> and diligence that a prudent person would have used.  29 U.S.C. Sec.
> 1104.  The continuing claims doctrine applies to the series of fiduciary
> violations here because "the plaintiffs' claims are inherently
> susceptible of being broken down into a series of independent and
> distinct events or wrongs, each having its own associated damage."
> *[Miele*, F. Supp.2d at 102.]  Thus, all of plaintiffs' pled and unpled
> claims for ERISA fiduciary breaches are within the six-year time limit
> under section 1113 (Reply Brief at 21).

The plaintiffs contend that the Court should combine all of the alleged

breaches in their unplead claims to form one continuing violation.  The plaintiffs list

each unplead claim as follows: (1) the loan of $36,000 from CAAIG trust assets to the

defendant EOC Nassau as of August 31, 1986; (2) the pledge of plan assets to CEDC,

an affiliated credit union entity controlled by EOC Nassau, for use as collateral for a

loan by CEDC to EOC Nassau on July 2, 1987, December 29, 1987, and June 30,

1988; (3) the failure to collect delinquent contributions from EOC Suffolk, with "working papers" of the funds accountant Mitchell & Titus, LLP, showing an "Accounts Receivable" due and owing from EOC Suffolk as of August 31, 1996 and the same balance in the "General Ledger" as of August 31, 2000; (4) the use of plan assets to pay the travel expenses of George Grayback from September 1, 1989 to August 31, 1992; (5) the allegedly improper payment of health and welfare claims to George and Nola Grayback from 1987 to 1992; and (6) the payment of excessive administrative fees in the form of bonuses paid to Profile Commercial Corp. between 1988 and 1991.

The Court has already declined inclusion of claims (4) and (5) concerning payments for the benefit of George and Nola Grayback and will exclude them from the remainder of this discussion. The plaintiffs apparently ask the Court to append any untimely claims to a timely claim, arguing that all of these alleged breaches of fiduciary duty should be regarded as a single continuing violation for statute of limitations purposes.

The plaintiffs' reliance on the continuing violation doctrine is misplaced. The case law is devoid of any cases applying the continuing claims doctrine to fiduciary breaches arising from different activities. In the ERISA context, the continuing violation doctrine is used for statute of limitations purposes to analyze when a cause of action accrues. In certain instances, a new cause of action accrues for each violation where separate violations of the same type, or character, are repeated over

time.  These cases are marked by repeated decision-making, of the same character, by the fiduciaries.  For example, in *Bona v. Barasch*, No. 01CV2289, 2003 WL 1395932 (S.D.N.Y. March 20, 2003), the plaintiffs claimed a fiduciary violation for defendants' entry into improper investment services contracts, which were renewed within the statute of limitations period.  *Id.* at *2–5.  The defendants argued that the statute of limitations ran from the time of the first violation, the initial contract, and did not run anew for successive violations that merely maintained the status quo.  *Id.* at *19.  The court found that if the facts alleged were proven, the fiduciary duty "was violated each time defendants renewed imprudent contracts with fund administrators."  *Id.* at 19; *see also Martin,* 966 F.2d at 1078, 1087–88 (finding that renewal of a contract gave rise to a new independent cause of action because to relegate the date of accrual to the first date the contract was agreed upon would ignore "the continuing nature of a trustee's duty under ERISA to review plan investments and eliminate imprudent ones").  *Koch v. Dywer*, No. 98CV5519, 1999 WL 528181, at (S.D.N.Y. July 22, 1999)(finding that the plaintiff may pursue a claim for breach of fiduciary duty based on continued retention of an imprudent investment); *NYSA-ILA Medical & Clinical Services Fund v. Catucci*, 60 F. Supp. 2d 194, 199–200 (S.D.N.Y. 1999) (finding that successive inappropriate payments would give rise to a new cause of action "each time a fiduciary made an improper payment with Fund assets"); *Gruby v. Brady*, 838 F. Supp. 820 (S.D.N.Y. 1993) (holding that each time an excessive benefit payment was made, the fund was injured, giving rise to a new cause

of action); *Buccino*, 578 F. Supp. at, 1521–22) (holding that the fiduciaries' retention of an unlawful insurance plan was a continuous and repeated violation of the duty to review the plan investments).

Distinguished from those situations, where fiduciaries repeat violations of the same character over and over, are cases where the plaintiffs' claims are based on a single decision that results in lasting negative effects. The former results in a continuing violation, the latter does not. For example, in the case relied on by the plaintiffs, *Miele v. Pension Plan of New York State Teamsters Conference Pension & Retirement Fund*, 72 F. Supp. 2d 88 (E.D.N.Y. 1999), the plaintiff sued for breach of fiduciary duty based upon the manner in which his benefits were calculated. *Id.* The defendants argued that the plaintiff's claims were time barred because he filed suit more than six years after the date on which the defendants sent a final accounting of his benefits. *Id.* at 97. The plaintiff contended that his cause of action was preserved by the continuing claims doctrine because a new statute of limitations began to run upon each monthly payment of the miscalculated benefit. *Id.* at 100. The court held that there was no continuing violation—the date of the accounting was the only date on which his cause of action accrued —because "[i]t was entirely clear to both parties that the defendants' calculation would apply to each and every monthly payment in perpetuity." *Id.* at 101.

The *Miele* court distinguished the case before it from cases where the monthly denial of benefits constituted a separate wrong each month based on the initial alleged

illegal act. *Id.* (distinguishing *Riley v. MEBA Pension Trust*, 570 F.2d 406, 411 (2d Cir. 1977)). To articulate this distinction, the court stated:

> It is well-settled that the continuing claims doctrine does not apply to a claim based on a single distinct event which has ill effects that continue to accumulate over time. . . . Rather, for the continuing claim doctrine to apply, the plaintiff's claims must be '*inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages*.' As stated above, this court finds that the plaintiff's miscalculation claims are a direct result of the defendants' single alleged miscalculation; as a result, the court does not find plaintiff's monthly checks to be independent and distinct wrongs, but rather mere ill effects of the one time-calculation.

*Id.* at 102 (citing *Brown Park Estates-Fairfield Development v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997) (emphasis added); *see also Schultz v. Texaco, Inc.*, 127 F. Supp. 2d 443 (S.D.N.Y. 2001) (rejecting plaintiff's continuing violation claim and finding that no new cause of action arose each time the plaintiff received a check based upon a single misclassification of his status).

Although the plaintiffs' "series of independent and distinct events or wrongs" language is facially appealing, the various breaches in the unplead claims alleged in this case are not susceptible to a continuing claims theory because they are not breaches of the same character repeated over time. There are no cases that conglomerate breaches of different character to form one continuing violation for statute of limitations purposes. Therefore, the plaintiffs' contention with respect to a continuing violation is unavailing and each of the plaintiffs' claims must individually be analyzed for timeliness.

5. **Application of the Statute of Limitation Rules to the Causes in this Case**

    (a) **As to the Pleaded Alleged ERISA Violations**

In this case, the Court will have to consider two different sets of allegations by the plaintiffs; the pleaded and the non-pleaded causes of action. These are all ERISA claims based on a breach of a fiduciary duty.

Plaintiffs' counsel confirms the nature of the pleaded causes in his reply brief:

> The gravamen of the pleaded claims in the instant action are: (1) defendants' diversion of the reserves allocable to L.I. Head Start to pay the welfare claims of defendants' employees, (2) defendants' failure to collect delinquent contributions from Yonkers CAP, and (3) defendants' failure to make the necessary contributions to adequately fund the plan. The critical question is when the statute of limitations begins to run on these ERISA violations.

(Reply Brief at 11.)

As stated above, each of the pleaded claims for relief are based on the allegations (1) that the defendants diverted the reserves of L.I. Head Start to pay benefits and administration expenses; (2) the defendants' failure to collect delinquent contributions from Yonkers CAP; and (3) that the defendants failed to take other actions such as increasing premiums to adequately fund the plan.

Although the amended complaint was 45 pages and included 206 separate paragraphs, it appears that the above claims constituted the plaintiffs' pleaded ERISA breach of fiduciary duty violations. Plaintiffs' counsel further confirmed this during the trial.

What we are saying is those reserves paid by Long Island Head Start

> on behalf of their employees, those allocable reserves should be
> returned to us.

Tr. at 1374.

> Here we are asking primarily that the trustees violated their fiduciary
> responsibility by failing to return the reserves allocable to the class
> plaintiffs. That conversion of assets is what this case is all about.

Tr. at 1480.

> Yes, your Honor. I'm saying it was diverted. That they used the
> money for their . . . and this is where the self-dealing comes in, by the
> way. This is where the prohibited transaction came in; that they used
> it for their own purposes.

Tr. at 2266.

Therefore, other than the two unjust enrichment claims (the Third and

Fourteenth claims for Relief) and the two claims brought by the plaintiffs as judgment

creditors (the Twenty-third and Twenty-fourth claim for Relief) all of the plaintiffs'

pleaded claims assert causes of action based on alleged breaches of fiduciary duty

under ERISA. As such they are subject to the statutes of limitations contained in 29

U.S.C. § 1113.

The Court will now determine the applicable statute of limitations as to these

pleaded alleged ERISA violations.

### 1) <u>As to the Alleged Diversion of the Reserve Funds</u>

Anthony Macaluso, former Director of Finance for L.I. Head Start, reviewed

the CAAIG financial records during his testimony. It was his opinion that, beginning

"in 1995 and subsequent to that year . . . the reserves attributable to L.I. Head Start . .

43

. were being invaded to pay claims and expenses of the other participating agencies."
(Tr. 42-43).

Macaluso further testified that the diversion of trust reserves commenced in 1995 and continued until March 2001, when the reserves were depleted. (See Pls. Ex. 5). He testified that the CAAIG financial statements were provided to him by Miuccio for the first time in 2003 or 2004. A report written by Macaluso further established that the diversion of trust funds commenced in 1995 and continued to March 2001, when the reserves were depleted.

Attorney Miuccio contends in the Reply Brief that he was unable to learn the facts earlier about the diversion because the Court and Magistrate Judge Michael L. Orenstein both precluded him from inquiring as to the diversion of reserves or any CAAIG transaction, until after judgment was entered in the prior action. According to Miuccio, it was only during the course of discovery in supplementary proceedings after judgment was entered in 2000 that he first learned of the facts giving rise to the present diversion action against the defendant agencies.

Based on the above evidence, the plaintiffs contend that the complaint, having been filed on December 13, 2000, was well within the statutory six-year limit. However, plaintiffs' counsel "concedes that L.I. Head Start, Phyllis Simmons, former president of L.I. Head Start, Macaluso and class counsel (Miuccio) were aware of the trustees' refusal to return the allocated reserves to L.I. Head Start in 1992", but this awareness "cannot be charged to the unnamed members of the class." Also, counsel

for the plaintiffs reiterates the rule that, in regard to ERISA § 1113, a plaintiffs'
constructive knowledge (what they should have known), is insufficient. Actual
knowledge is required.

No proof was offered by the defendants to contest the dates advanced by
Macaluso. Therefore, the Court finds that there was evidence adduced at the trial that
this so-called "diversion of trust funds" did occur between 1995 and March 2001.
Section 1113(1)(A) provides for claims of fiduciary breaches to be brought within six
years after "the date of the last action which constituted a part of, or the breach or
violation . . .".

Therefore, as the last act constituting part of this claim occurred as late as
2001, the Court finds that this pleaded "diversion" fiduciary violation cause of action
is timely.

### 2) <u>As to the Alleged Failure to Collect Delinquent Contributions<br>from Yonkers CAP</u>

As to the cause of action involving the defendants' failure to collect
contributions for Yonkers CAP, the plaintiffs' Reply Brief is somewhat confusing. It
builds the six-year breach of fiduciary duty statute of limitations on the six-year
breach of contract statute of limitations. Further, the plaintiffs complain that the
defendants failed to introduce any evidence as to the specific date for the accrual of
the statute of limitations. Counsel for the plaintiffs makes the unusual argument that
even if the accrual of the six-year statute of limitations to collect the Yonkers CAP
delinquency began on August 31, 1990, the correct accrual period is six years later on

August 31, 1996, after the time for the Trustees to sue Yonkers CAP for breach of contract expired. Therefore, according to plaintiffs' counsel this six-year breach of fiduciary duty expired six years later on August 31, 2002. According to the plaintiffs' counsel, because the instant complaint was filed on December 13, 2000, this claim was not time-barred by the six-year limitation period in Section 1113. The Court disagrees. The Court finds that accrual period commenced on or about August 31, 1990, when the participation agency declined to collect the Yonkers CAP delinquency.

The documentary evidence clearly demonstrates the factual background for this claim. On September 26, 1989 George Grayback, the CAAIG Claims Administrator, wrote to Judith Wilson, Director of Yonkers CAP, with regard to the delinquency. (Pls. Ex. 22). In this letter, the Yonkers CAP indebtedness had reached the amount of $73,644.55 and Grayback stated that "immediate payment by return mail is urgently required." On May 17, 1990, in another letter from Grayback to Wilson (Pls. Ex. 23), participation of Yonkers CAP and its employees in CAAIG was terminated effective April 1990. Reinstatement would be considered provided "past due and current premiums were paid." In a letter from Grayback to Wilson dated July 25, 1990, Yonkers CAP was reinstated (Pls. Ex. 24). At that time the Yonkers CAP arrears had reached the sum of $99,480.87 and it was supposed to pay $10,000 per month to be applied to "current premium and pay back of arrears."

However, even after reinstatement, the Yonkers CAP default continued. In a

letter from Grayback to Wilson dated January 29, 1991 (Pls. Ex. 25), again Yonkers CAP was in default and he notified CAAIG to cancel the Yonkers CAP coverage effective December 31, 1990 if the current premium was not received by January 31, 1991.  Wilson wrote to Kearse on September 14, 1992 asking if Yonkers CAP would be allowed to rejoin CAAIG (Pls. Ex. 26).  In this letter, Wilson stated: "John, your endurance and support has been appreciated over the past two difficult years.  Thank you for being there."  (Pls. Ex. 26).  The final straw came on January 26, 1993, in a note from Grayback stating: "I spoke to Mr. Kearse and he says it's OK to write off Yonkers and to show total reserves as one figure."  (Pls. Ex. 27).

The CAAIG financial report for the fiscal year which ended on August 31, 1990 reflects "Accounts Receivable due from . . . Yonkers $104,514." (Pls. Ex. 11). At a meeting of the Board of Trustees of CAAIG held on December 14, 1993, there is a notation in the minutes that "authorization was given to the administrators to write off $102,000, which was the balance due from the Yonkers program participants." (Pls. Ex. 20).  At the meeting, Trustee Fassett questioned the status of the Yonkers repayment plan.  Trustee Kearse then recapped the Yonkers situation, stating, in part: "Collectively our solidarity has been maintained so that no one goes out of business. We will support [Yonkers CAP] as long as possible, without putting the plan in jeopardy.  The reserve could be used . . . Administrator Grayback said that Trustee Wilson was now paying $1500 a month, and will pay more, if possible, later on." (Pls. Ex. 20).  Thus, giving the plaintiffs the benefit of all reasonable factual

scenarios, it appears that the claim with regard to the delinquent contribution from Yonkers CAP did not accrue until December 14, 1993.

The Court finds that the Yonkers CAP cause of action accrued in 1993, at the latest. This Complaint filed on December 13, 2000 is untimely.

This Yonkers CAP claim is barred by the six-year statute of limitations.

### 3) Defendants' Failure to Make the Necessary Contributions to Adequately Fund the CAAIG Plan and Prevent Diversion of the Plaintiffs' Reserves

In this case, L.I. Head Start was notified in 1992, when it terminated its participation in CAAIG that its demand for the return of the reserve funds held in its name was rejected. At that time, L.I. Head Start was further notified that the reserve money would be used to pay the benefits of the employees of the remaining participating agencies and the administrative expenses of CAAIG.

A review of the Macaluso Report (Pls. Ex. 5) reveals that starting in 1995, the reserves in CAAIG were reduced from $1,088,340 to $474,924 in 1996; to $373,054 in 1997; and to $335,298 from September 1997 to March 2001. Similar to the first pleaded cause of action, this alleged diversion of the L.I. Head Start reserve funds in CAAIG commenced in 1995 and continued until March 2001, when the reserves were depleted. The Court once again notes that the awareness of Attorney Miuccio, Phyllis Simmons, former President of L.I. Head Start and Macaluso of facts relating to this cause of action are not imputed to the class members.

ERISA Section 1113(1)(A) directs that a claim for a breach of a fiduciary duty

must be brought within six years of "the date of the last action which constituted a part of the breach or violation."  According to the testimony of Macaluso, supported by his Report, the first act of diversion occurred in 1995 and the last act was in March 2001.  This Complaint was filed on December 13, 2000.

Thus, the Court finds that the plaintiffs' "diversion claims" are within the six-year statutory time limit and are not barred by the statute of limitations.

### (b)  As to the Non-Pleaded Causes

#### 1)  As to the Pledge of CAAIG Assets to CEDC for the Benefit of EOC Nassau

CAAIG made a pledge of plan assets to CEDC, an affiliated credit union entity, for use as collateral for a loan by CEDC to EOC Nassau.  These transactions occurred on July 2, 1987 (Pls. Exs. 89 and 90), December 29, 1987 (Pls. Ex. 91) and June 30, 1988 (Pls. Ex. 92).  Applying the six-year statute of limitations, this cause of action is clearly untimely.

#### 2)  As to the $36,000 Loan to EOC Nassau

The audit confirmation letter dated February 25, 1987, signed by John Kearse as Chief Executive Officer of EOC Nassau (Pls. Ex. 44), confirms a loan balance of $36,000 due and owing to CAAIG as of August 31, 1986.  This cause of action is also untimely.

#### 3)  As to the Failure by CAAIG to Collect the Delinquent Arrears in Premium Payments by EOC Suffolk

The "working papers" of Mitchell & Titus, LLP, the certified public

accountants employed by CAAIG (Pls. Ex. 17), demonstrate that, as late as August 31, 1996, there was an "account receivable" for EOC Suffolk in the amount of $9,000. At this juncture, this evidence – not refuted or supplemented by the defendants, is sufficient to refute the defense of the six-year statute of limitation. This unpleaded claim is timely.

### 4) <u>As to the Bonuses Paid to Profile Commercial Corp.</u>

The final non-pleaded cause involves the alleged excessive payments to Profile. These payments, in the form of bonuses, occurred between 1988 and 1991. This information was given to Attorney Miuccio in a letter from the defendants' former attorney Allen B. Breslow, dated July 7, 1995 (Pls. Ex. 76), as follows:

> The bonuses paid to Profile are as follows: $20,000.00 in each of the following years 1988, 1990 and 1991 as evidenced by check number 271 dated December 20, 1988, check number 115 dated December 16, 1990 and check number 1032 dated December 28, 1991. It is possible that another payment of $20,000 was made in 1989 but we cannot locate a check for that payment.

In addition, Miuccio deposed Kearse concerning the "$20,000 bonuses" and the other bonuses to Profile during depositions on July 11, 1995 and January 30, 1996, where Macaluso was also present (Dfts. Exs. AJ and AK). In those depositions, Miuccio marked in evidence three $20,000 checks from CAAIG to Profile, the last bearing a date of December 21, 1991. (See, Dfts. Ex. E - check from CAAIG to Profile dated December 21, 1991). However, there is, apparently, no evidence adduced of bonus payments to Profile subsequent to 1992. Accordingly, this unpleaded cause of action involving bonuses to Profile, is untimely.

50

**C)** <u>As to the Plaintiffs' Application to Apply the Doctrine of Collateral Estoppel to the Actions of the Defendants vis-a-vis "Law of the Case"</u>

In the plaintiffs' initial post-trial brief, it states that the "Defendants are Collaterally Estopped From Arguing Issues Determined in the Prior Action," (Plaintiffs' Post-Trial Brief at 5).   On the other hand, the defendants contend that they are not bound by the doctrine of collateral estoppel concerning the essential factual issues in this case because they were not parties in the prior 1993 action and had no opportunity to litigate the issues arising in that proceeding.  The Court agrees and finds that the doctrine of collateral estoppel does not apply.

Collateral estoppel prevents a party from re-litigating, in a subsequent proceeding, an issue of fact or law that was fully and fairly litigated in a prior proceeding.  For a plaintiff to bar a defendant from litigating an issue based on collateral estoppel:  (1) the issues in the proceedings must be identical; (2) the issues in the prior proceedings must have been actually litigated and actually decided; (3) the defendants must have been afforded a full and fair opportunity for litigation in the prior proceeding; and (4) the issues previously litigated must have been necessary to support a valid and final judgment on the merits.  *Faulkner v. National Geographic Enterprises, Inc.,* 409 F.3d 26, 37 (2d Cir. 2005).

Here, the defendants were not parties in the 1993 action, and therefore had no full and fair opportunity to litigate in that action.  *See Alpert's Newspaper Delivery, Inc. v. The New York Times Comp.,* 876 F.2d 266, 270-271 (2d Cir. 1989).  The plaintiffs mistakenly rely exclusively on what they characterize as the Court's prior

51

determinations on certain factual issues, and do not advance any argument or facts to establish that defendants were afforded a full and fair opportunity to litigate in the 1993 action.

However, the Court finds that the doctrine of "the law of the case" does apply to certain findings of fact made by this Court in its prior decision. As the Court stated during the trial:

> THE COURT: If I decided that that agreement was invalid, that agreement is invalid. I don't care who the parties are.
>
> MR. MIUCCIO: You also decided that it was a separate agreement.
>
> THE COURT: I mean we are not going to relitigate that issue about whether the agreement was invalid. That has nothing to do with collateral estoppel. That's an established fact since there was no appeal. Was there?
>
> MR. MIUCCIO: They just objected.
>
> THE COURT: Nobody mentioned the law of the case. That's what it is. I'm not talking collateral estoppel. That's a different concept. But when I decided those facts, that's decided already.
>
> \* \* \* \*
>
> And my decision at 86 F. Supp. 2d 143, was as follows. And the heading was the contested facts.
>
> 1. Were the funds segregated or pooled?
>
> Decision: Based on the documentary evidence and the testimony adduced at the trial, the Court finds that CAAIG segregated the contributions of each of the participating employers and directly allocated that benefits paid and the proportionate CAAIG administrative expenses to each of the contributing employers. That's Fact 1.

Fact 2.  As to the validity of the October 6, 1983 agreement –
and I went through the testimony and then I said: Accordingly, the
Court finds that the purported October 6, 1983 agreement is not
authentic and cannot be considered by the Court.

That's it.  Then I found also, as far as the August 7, 1986
amendment, was it properly ratified?

\*    \*    \*    \*

As the amendment was never signed – quote, as the amendment
was never signed, adopted or ratified by the board of directors, which
was required by the terms of the October 4, 1983 trust agreement, the
Court finds that the August 7, 1986 amendment was not properly
adopted, and is not valid.

Accordingly, based on the findings set forth above, the Court
finds that the October 4, 1983 trust agreement is controlling.  This
agreement does not contain any provision prohibiting the return of the
reserves to the departed contributing employer, end quote.  That was a
big key to the case.

Now it's true this [sic] these defendants were not named as
parties.  That Mr. Kearse was not named as a party.  How that plays
out is very interesting.  And I'm going to take a brief recess and let me
see how it plays out.  If you want me to.  Otherwise if you want to put
a witness on, it's up to you.

MR. MIUCCIO: I prefer to put a witness on so we can get him

THE COURT: Okay.

Tr. at 54-57.

"As most commonly defined, the doctrine [of law of the case] posits that when

a court decides upon a rule of law, that decision should [generally] continue to govern

the same issues in subsequent stages in the same case." *Arizona v. California*, 460

U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1981). The purpose of the law of the

case is "to 'maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.'" *Devilla v. Shriver*, 245 F.3d 192, 197, (2d Cir. 2001) (quoting 18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4478 at 788 (3d Ed. 1998)). Unlike the doctrines of *res judicata* and collateral estoppel, the law of the case, "merely expresses the practice of the courts generally to refuse to reopen what has been decided." *Devilla*, 245 F.3d at 197 (quoting *Messinger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912)); *see North River Ins. Co. v. Philadelphia Reinsurance Corp.*, 63 F.3d 160, 164 (2d Cir. 1995) "It is, 'at best a discretionary doctrine.'" *Devilla*, 245 F.3d at 197 (quoting *United States v. Williams*, 205 F.3d 23, 24 (2d Cir. 2000)).

The limitations on the "law of the case" doctrine were stated in *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 564 (2d Cir. 1998): "First, the [law of the case] doctrine 'is, at best, a discretionary doctrine, which does not constitute a limitation on the court's power' but merely expresses a general reluctance, absent good cause to reopen rulings that the parties have relied upon." *Id.* (quoting *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 131 (2d Cir. 1997), *cert denied,* 522 U.S. 948, 118 S.Ct. 365, 139 L.Ed 2d 284 (1997)).

Although the doctrine is ordinarily applied in later stages of the same lawsuit, it also has application to different lawsuits between the same parties. *See In re: PCH Associates* 949 F.3d 585, 592 (2d Cir. 1991); *Schupak v. Califano*, 454 F. Supp. 105, 114 n.17 (E.D.N.Y. 1978).

The major grounds justifying reconsideration by a judge of a prior definitive ruling are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." 18 Wright, Miller & Cooper, Federal Practice & Procedure § 4478 at 790; *accord, Doe v. New York City Dept. Of Social Services*, 709 F.2d 782, 789 (2d Cir. 1983) (discussing law of the case in the appellate context), *cert. den.* 464 U.S. 864 (1983).

The Court finds that none of the reasons supporting a departure from the Court's rulings in the prior action are present. There was no intervening change of controlling law and no clear error or manifest injustice. Also, during this present trial there has been no presentation of evidence that would bear on the prior decisions of this Court.

Therefore, the Court finds that the following facts are established, as to the issues in this trial:

1.     CAAIG was not a pooled fund and that each of the contributing employer's funds were segregated.

2.     The purported October 6, 1983 "agreement" was not authentic and is not valid.

3.     The August 7, 1986 Trust Agreement was not properly adopted and is not valid.

### D)  <u>As to the Unjust Enrichment Claims</u>

In the amended complaint, there are two claims for unjust enrichment (the Third and Fourteenth claims for relief).  The Third claim asserted against the defendants EOC Nassau, EOC Suffolk, and Yonkers CAP, alleges that the "defendants have been unjustly enriched to the extent of the monies diverted from the Class Reserves and wrongfully used to pay benefits to the employees of the defendants," (Complaint at ¶¶ 63-65).  The Fourteenth claim asserted against the same three defendants interposes a claim on behalf of the plaintiff Paul Adams "derivatively on behalf of CAAIG."  As to Adams, the Court notes that the amended complaint states that "Paul Adams ("Adams"), a former participant, acting for himself, as certified class representative and on behalf of all others similarly situated, bring this action against defendants to redress fiduciary violations in which defendants participated as ERISA fiduciaries and employers."  This claim alleges that the "defendants have been unjustly enriched to the extent of the monies diverted from the Class Reserve and wrongfully used to pay benefits to the employees of defendants."  (Complaint at ¶¶ 108-110).

Under New York law, for a plaintiff to prevail on a claim of unjust enrichment, he or she must establish that (1) the defendant was enriched; (2) the enrichment was at the plaintiff's expense; and (3) the circumstances are such that in equity and good conscience, the defendants should return the money or property to the plaintiff.  *Beth Israel Medical Center v. Horizon Blue Cross & Blue Shield of N.J.*,

448 F.3d 573, 586 (2d Cir. 2006); *Golden Pacific Bancorp. v. Federal Deposit Insurance Corp.*, 273 F.3d 509, 519 (2d Cir. 2001); *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 79 (2d Cir. 1986) (applying New York law). The third factor is critical, and the plaintiffs' must show that "as between the two parties to the transaction the enrichment is unjust." *McGrath v. Hilding*, 41 N.Y.2d 625, 629, 394 N.Y.S.2d 603, 606 (1977).

The nature of an unjust enrichment claim in New York law is that of a quasi-contractual claim; an obligation that the law creates in the absence of any agreement. *Beth Israel Medical Center*, 448 F.3d at 587. The statute of limitations for unjust enrichment begins to run when a defendant accepts the benefits bestowed upon him. *See, e.g., Freeman v. Bianco*, No. 02CV7525, 2003 WL 179777 at *4 (S.D.N.Y. Jan 24, 2003) or upon occurrence of the wrongful act giving rise to the duty of restitution. *Plitman v. Leibowitz*, 990 F. Supp. 336, 337 (S.D.N.Y. 1998).

New York CPLR 213(1) provides that:

"The following actions must be commenced within six years: 1. An action for which no limitation is specifically prescribed by law."

New York courts have applied a six year statute of limitations for a claim of unjust enrichment involving breach of fiduciary duty. *Golden Pacific,* 273 F.3d at 518; *see also Loengand v. Santa Fe Indus., Inc.,* 70 N.Y.2d 262, 519 N.Y.S.2d 801, 803, 514 N.E.2d 113 (1987) (unjust enrichment as a result of a breach of fiduciary obligation); *Niagara Mohawk Power Corp. v. Freed*, 265 A.D.2d 938, 696 N.Y.S.2d 600, 603 (4th Dep't 1999) (unjust enrichment and breach of fiduciary duty).

In this case, the unjust enrichment cause of action accrued upon occurrence of the alleged wrongful act of diverting money from L.I. Head Start reserves and using that money to pay benefits to the other participants. L.I. Head Start discontinued its participation in CAAIG on September 1, 1992. The L.I. Head Start reserves were apparently used by the other participants from the year 1992 until the CAAIG funds were depleted in 2001. Applying the six-year limitation period, all unjust enrichment claims based on events which occurred prior to December 1, 1994 are barred by the statute of limitations and must be dismissed.

However, as to the unjust enrichment claims, a review of the law involving the statute of limitations does not end this Court's determination. In addition to the statute of limitations defense, the plaintiffs' unjust enrichment claim also appears to fail on the merits with regard to the third prong. It may not have been against equity and good conscience for the CAAIG Fund to have used the monies from the so-called "Class Reserve" to pay benefits to the employees of the defendants. At that time, certainly, there were no such legal prohibitions. *See, e.g., In re Mid-Island Hospital Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) ("Mid-Island's claim fails on the third prong; it is not against equity and good conscience to retain funds pursuant to a statutory or regulatory mandate."); *Macdraw, Inc. The CIT Group Equipment Financing, Inc.*, 157 F.3d 956, 963 (2d Cir. 1998) (under New York law, the plaintiff must show that as between the two parties enrichment of the defendant was unjust); *Marcus v. AT&T Corp.*, 138 F.3d 46, 64 (2d Cir. 1998); *Carriafielio-Diehl & Associates, Inc. v. D&M*

*Electrical Contracting, Inc.*, 12 A.D.3d 478, 784 N.Y.S.2d 617 (2d Dep't 2004) (embezzled funds were diverted); *Podolsky v. Citation Abstract, Inc.*, 279 A.D.2d 559, 719 N.Y.S.2d 694 (2d Dep't 2001) (defendant improperly retained moneys disbursed from an escrow account); *Wiener v. Hazard Fires & Co.*, 241 A.D.2d 114, 672 N.Y.S.2d 8, 13 (1st Dep't 1998) ("The receipt of a benefit alone . . . is insufficient to establish a cause of action for unjust enrichment."); *Swiss Air Transport Ltd. v. Benn*, 128 Misc.2d 657, 494 N.Y.S.2d 781 (App Term 1st Dep't 1985) (finding unjust enrichment where the defendant procured and presented two altered airline tickets).

Before the Court makes a determination that, prior to the resolution of the prior proceeding, the diversion of the reserves to pay the benefits of the other participants was not against equity and good conscience sufficient to sustain an unjust enrichment claim, as a matter of law, the parties should be given an opportunity to address this issue.

## IV. CONCLUSIONS

As to the three issues to be decided in this bifurcated situation, the Court finds the following:

A)      The plaintiffs' motion to amend the complaint and/or to conform the pleadings to the proof is granted as to the following four issues:

1)  The pledge of CAAIG plan assets to CEDC, an affiliated credit union entity controlled by EOC Nassau, for use as collateral for a loan by

CEDC to EOC Nassau.

      2) The loan of $36,000 of CAAIG plan assets to EOC Nassau.

      3) The failure to collect delinquent employer contributions from EOC Suffolk, which the plaintiffs allege constitutes a lending of money or extension of credit to a party-in-interest.

      4) The CAAIG payment of excessive administrative fees in the form of bonuses to Profile Commercial Corp., a fiduciary and party-in-interest.

B)      As to the defense of the statute of limitations, the Court finds the following pleaded and non-pleaded causes are barred by the six-year ERISA statute of limitations.  Therefore, the Court grants the defendants' Rule 52(c) motions for judgment as a matter of law, dismissing these causes of action based on the defense of the statute of limitations:

      1) The failure to collect delinquent contributions from Yonkers CAP.

      2)  The pledge of CAAIG assets to CEDC with regard to the loan to  EOC Nassau.

      3) The loan of $36,000 of CAAIG plan assets to EOC Nassau.

      4) The bonuses paid to Profit Commercial Corp.

C)      There is no viable defense of collateral estoppel.

D)      As to the Third and Fourteenth causes of action based on unjust enrichment, all such claims based on events which occurred prior to December 1, 1994 are dismissed.

To determine what future proceedings are necessary in this case, the attorneys are directed to attend a status conference on June 26, 2008 at 9:00 a.m.

**SO ORDERED.**

Dated: Central Islip, New York
June 3, 2008

_____*/s/ Arthur D. Spatt*_____
**Arthur D. Spatt**
**United States District Judge**