UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
L.I. HEAD START CHILD DEVELOPMENT
SERVICES, INC., PAUL ADAMS, derivatively
on behalf of COMMUNITY ACTION
AGENCIES INSURANCE GROUP and as
class representative of all other persons similarly
situated,

                    Plaintiffs,

                - against -

ECONOMIC OPPORTUNITY COMMISSION
OF NASSAU COUNTY, INC., ECONOMIC
OPPORTUNITY COUNCIL OF SUFFOLK,
INC., YONKERS COMMUNITY ACTION
PROGRAM, INC., and STELLA B. KEARSE
as Representative of the ESTATE OF
JOHN L. KEARSE, Deceased.

                  Defendants.
-------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**

 CV 00-7394 (ADS)

**A P P E A R A N C E S :**

    **WELBY, BRANDY & GREENBLATT, LLP**
    Attorneys for Plaintiffs
    11 Martine Avenue
    White Plains, NY  10606
    By:    Alexander A. Miuccio, Esq.
           of Counsel

    **MARK E. GOIDELL, ESQ.**
    Attorneys for Defendants
    Economic Opportunity Commission
    of Nassau County, Inc. and
    Yonkers Community Action Program Inc.
    377 Oak Street, Suite 101
    Garden City, NY  11530

**BARRY V. PITTMAN, ESQ.**
Attorney for Defendant
Economic Opportunity Council of Suffolk, Inc.
26 Saxon Avenue
P.O. Box 5647
Bay Shore, NY 11706-0455

**LAW OFFICES OF FREDERICK K. BREWINGTON**
Attorneys for Defendant
Stella B. Kearse as Representative of the Estate of
John L. Kearse, Deceased
565 Peninsula Blvd.
Hempstead, NY 11550
By:     Frederick K. Brewington, Esq.
        Of Counsel

**SPATT, District Judge.**

In a prior decision in this case, <u>L.I. Head Start Child Dev. Serv. Inc., et al. v. Economic Opportunity Commission of Nassau County, Inc., et al.</u>, 634 F. Supp. 2d 290 (E.D.N.Y. 2009), the Court determined that defendants Economic Opportunity Commission of Nassau County, Inc. ("EOC Nassau"), Economic Opportunity Council of Suffolk County, Inc. ("EOC Suffolk"), Yonkers Community Action Program, Inc. ("Yonkers CAP") (collectively the "agencies"), and John L. Kearse ("Kearse") violated their fiduciary duties under the provisions of the Employee Retirement Income Security Act ("ERISA") by failing to make and ensure the necessary contributions to adequately fund the Community Action Agencies Insurance Group welfare plan ("CAAIG" or "Plan").

At the inception of the damages trial, the Court made the following rulings on the measure of damages:

> ". . . the plaintiffs have established that the defendants violated their
> fiduciary duties under the provisions of ERISA by failing to make the necessary

contributions to adequately fund the CAAIG Plan.

> And of necessity, I am ruling that those damages are:

> Number 1, the amount of money that was not contributed in violation of their fiduciary duty. That's number 1. Namely, the unpaid contributions.

> Number 2, interest, prejudgment interest on the unpaid contributions.

> Number 3, reasonable attorneys' fees.

> And number 4, costs of the action."

Tr. at D21.[1]

Further, as to the time period involved, in the Court's prior June 3, 2008 opinion, the

Court fixed the applicable statutory time limit as follows:

> [13] ERISA Section 1113(1)(A) directs that a claim for a breach of a fiduciary duty must be brought within six years of "the date of the last action which constituted a part of the breach or violation." According to the testimony of Macaluso, supported by his Report, the first act of diversion occurred in 1995 and the last act was in March 2001. This Complaint was filed on December 13, 2000.

> Thus, the Court finds that the plaintiff's "diversion claims" are within the six-year statutory time limit and are not barred by the statute of limitations.

L.I. Head Start Child Dev. Servs. Inc., et al. v. ECON Opportunity Commin. Of Nassau County,

Inc., et al., 558 F. Supp. 2d 378, 405 (E.D.N.Y. 2008).

---

[1] Tr. refers to the trial transcripts. "L" refers to the liability portion of the trial transcript. "D" refers to the damages portion of the trial transcript.

# I.  **Contentions**

## A.  **The Plaintiffs' Contentions**

Based on the testimony of Anthony Macaluso, plaintiffs' expert witness, the plaintiffs presented two alternatives.  First, Macaluso testified that the total amount of unfunded contributions due to the Plan from the three defendant agencies for the period from 1993 to June 1998 is $918,273.  (Plfts' Ex. D-1).  He further computed the allocation of unfunded contributions due from each agency as follows:  EOC Nassau $719,008; EOC Suffolk $122,130; and Yonkers CAP $77,135.

Macaluso also calculated an alternative measure of damages to the Plan based on a reserves formula presented by Sedgwick Noble Towndes ("Sedgwick") an actuarial consultant retained by EOC Nassau.  Macaluso's alternative written analysis utilizes the Sedgwick formula based on reserves of seven and one-half months.  For the 1993 to May 31, 1998 period, the total amount of unfunded contributions owed to the Plan by the three agencies is $787,833.  The unfunded contributions due from each agency is:  EOC Nassau $569,893; EOC Suffolk $96,802; and Yonkers CAP $61,138.

The plaintiffs also contend that they are entitled to enforce their prior May 25, 2000 judgment against CAAIG.  The balance due under this prior judgment due from CAAIG to the plaintiffs is $717,311, ($802,872 less the amount paid of $85,561), with post judgment interest from May 25, 2000.  In the prior decision of July 8, 2009, L.I. Head Start, 634 F. Supp. 2d at 316, the Court ruled as to the enforceability of the prior judgment, as follows:

> However, with regard to the plaintiffs' remaining two claims, the Court
> has determined that the defendants in this action are indebted to the CAAIG Plan

4

for (1) failure to make and ensure the necessary contributions to adequately fund the CAAIG Plan; and (2) failure to collect delinquent contributions from EOC Suffolk in the amount of $9,000. CAAIG is in turn indebted to the plaintiffs in the prior action as a result of the May 25, 2000 judgment. Accordingly, upon a proper showing of notice to the judgment debtor CAAIG, of both this action and the petition for collection pursuant to CPLR 5227, the Court will, in its final order of judgment, include a directive that the defendants in this action turn over to the plaintiffs in the prior action, as judgment creditors, sums presently owed pursuant to the May 25, 2000 judgment. RCA Corp. v. Tucker, 696 F. Supp. 845, 850 (E.D.N.Y. 1988).

The plaintiffs also contend, pursuant to the prior ruling of the Court, that they are entitled to reasonable attorneys' fees, prejudgment interest and costs. As to the attorneys' fees, plaintiffs' counsel stated that he will submit his application "subject to the further direction of the Court." (Pltfs' Post Trial Memorandum at 15). As to prejudgment interest, the plaintiffs' request that the Court should apply such interest on each annual amount when due as shown in Macaluso's reports at the end of each fiscal year commencing with the fiscal year which ended on August 31, 1995 and May 31, 1996, August 31, 1997 and June 30, 1998, when the Plan was terminated.

## B. The Defendants' Contentions

In sum, the defendants refute all of the plaintiffs' contentions as to damages, attorneys' fees and prejudgment interest. Among the defendants' multiple contentions they assert that the plaintiffs cannot recover as a judgment creditor of CAAIG. The defendants also contend that "no damages are due under the Trust Agreement, nor were the Plaintiffs damaged in any way. They are entitled to no more than nominal damages." (Dfts' Joint Post-Trial Brief at 2).[2] Also, primarily because the Court determined the "major issue" in this case, the alleged diversion of

_____

[2] The "Defendants' Joint Post-Trial Brief Addressing Damages" will be referred to in this decision as the "Dfts' Brief".

the L.I. Head Start reserves against the plaintiffs (634 F.Supp. 2d at 310), attorneys' fees and prejudgment interest should not be awarded to the plaintiffs.

The defendants also object to the Macaluso calculation in which the contributions per year were doubled to determine the amount of annual contributions that he asserted should have been paid by the defendant agencies. The defendants make multiple other objections to the method of computation by Macaluso (see Dfts' Brief at 11 and 12). The defendants also assert that the "Sedgwick Method" was improperly inflated.

As to the statute of limitations, the defendants cite to the Court's June 3, 2008 Decision which states:

> ". . . the Court finds that there was evidence adduced at the trial that this so-called 'diversion of trust funds' did occur between 1995 and March 2001."

558 F. Supp. 2d at 403.

Therefore, say the defendants, all evidence supporting any failure to adequately fund the Plan before 1995 is irrelevant. That includes the plaintiffs attempt to calculate damages back to 1992 and fiscal year ending August 31, 1993. In addition, the defendants contend that any alleged failure to adequately fund the Plan after the termination of CAAIG on June 30, 1998 is irrelevant. So that, according to the defendants, the damages, if any, are limited to a time period from 1995 until June 30, 1998, when CAAIG was terminated.

Further the defendants remind the Court that Macaluso conceded that the defendant agencies complied in all respects with the directive in the Trust Agreement that the Plan's participating agencies "shall make the necessary contributions to provide the benefits expected to

become payable under this trust to payers or distributees under any plan."

As to reserves, the defendants point out that William Rowley, the representative of Profile Commercial Corp., employed by CAAIG to review their insurance program, did not testify that the reserves should be calculated by the sum of the prior year's paid claims, administrative expenses, managed care expenses and insurance premiums. Rather, Rowley testified that reserves of one year were a reasonable goal but not a rigid requirement. Also, he testified that the reserves should be ideally sufficient to cover one year of paid claims, not including administrative expenses, managed care expenses and insurance premiums. He also stated that the Plan was in "good condition." In addition, Rowley testified that the required reserves were reduced by the withdrawal of L.I. Head Start from the CAAIG in September 1992, resulting in a reduction of approximately half of the participants. Similarly, it was pointed out that the alternative Sedgwick analysis refers only to claims paid as the basis for future calculations, and not administrative expenses, managed care expenses and insurance premiums.

Also, in regard to the Agency contributions, the defendants contend that as to the claims paid and the amounts in reserve for each year as recorded in the Macaluso charts, "[t]hese contributions were more than necessary to comply with both the Rowley and Sedgwick suggestions." (Dfts' Brief at 14). They point to Macaluso's testimony that the first year that CAAIG was required to increase premiums was 1996 and there was a surplus of $243,436 on June 30, 1998, and that prior to that date, CAAIG had sufficient funds to pay all claims and expenses. The defendants' multiple contributions will be addressed in some detail in the Court's response, which follows.

**C.  The Court's Response to the Defendants' Contentions**

Initially, the Court notes that the defendants again contend that there are no damages because all claims and Plan expenses were paid.  Therefore, the defendants assert that they have complied with the obligations in the Trust Agreement to make the necessary contributions to adequately fund the Plan.  Again, the defendants raise the issue of their liability to make the necessary contributions to adequately fund the Plan.  The Court agrees with the plaintiffs' counsel that this contention ignores the Court's prior liability decision definitely finding that: "the plaintiffs have established, by a preponderance of the evidence, that the defendants EOC Nassau, EOC Suffolk, Yonkers CAP and the Estate of John L. Kearse violated their fiduciary duties under the provisions of ERISA, by failing to make the necessary contributions to adequately fund the CAAIG Plan."  (L.I. Head Start, 634 F. Supp. 2d at 316, 317).

Also, the defendants continue to assert that there are no damages at all because all the claims were paid to the beneficiaries in addition to all benefits and administrative expenses. Therefore, argue the defendants there is no loss to the Plan, and consequently, the claim for the defendants' failure to adequately fund the Plan should be dismissed.  This argument has been raised by the defendants on several occasions and has been rejected by the Court.  The Court's prior rulings were the law of the case; a doctrine that serves to "maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit."  18 Wright, Miller and Cooper, Federal Practice and Procedure § 4478 at 788.

As noted above, the defendants contend that "[t]here are no damages arising from defendants' conduct."  (Dft's Table of Contents).  This contention by the defendants is set forth

in nine categories in the Defendants' Joint Post-Trial Brief.  In essence, the defendants contend that there are no damages because all the claims and the Plan expenses were paid.  According to the defendants, (1) "No damages are due under the Trust Agreement, nor were the plaintiffs damaged in any way."  (Dfts' Brief at 2); (2) ". . . there was no dispute that all claims and expenses of the CAAIG were paid throughout its existence."  (Dfts' Brief at 4); (3) John L. Kearse resigned as a Trustee and fiduciary of the CAAIG pursuant to a Consent Judgment dated October 5, 1996. (Dft's Brief at 4); (4) the plaintiffs' witness Macaluso conceded that the defendant agencies complied with the Trust Agreement with regard to making the necessary contributions to provide the expected benefits. (Dfts' Brief at 12); (5) the reserves should be ideally sufficient to cover one year's paid claims, rather than the sum of paid claims, administrative expenses, managed care expenses and insurance premiums. (Dfts' Brief at 13); (6) Macaluso conceded that the defendants made all contributions required of them by the Trust Agreement. (Dfts' Brief at 14); (7) "Damages, if any, must be determined pursuant to the provisions of the Trust Agreement", and the overwhelming evidence establishes that the defendant agencies complied with their obligations under the Trust Agreement.  (Dfts' Brief at 17, 18); (8) Macaluso had no prior experience or familiarity with procedures to determine an appropriate amount of premiums or reserves.  (Dfts' Brief at 20); (9) Macaluso was not an actuary and never performed any expert analysis or testified as to those matters prior to the damages hearing.  (Dfts' Brief at 20); (10) "Here, plaintiffs . . . fail to establish damages with the requisite reasonable certainty.  (Dft's Brief at 21); (11) "It is self-evident (and conceded by Macaluso) that there were sufficient funds to pay all obligations of the CAAIG; with money still left over at the time of its termination."  (Dfts' Brief at 13); (12) "The proof at the damages trial

conclusively established that, in fact, there were always sufficient funds in the Plan to pay the medical claims of the employees and the administrative expenses of CAAIG." (Dfts' Brief at 24); and (13) the "exorbitant amounts" claimed by the plaintiffs are unrelated to any credible claims of damages sustained and reflect the "artificial and contrived formulas urged by Plaintiffs." (Dfts' Brief at 26).

The Court will now respond to these numerous contentions by the defendants.

It is a basic rule of law, routinely enforced, that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). This fundamental rule is to "maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." Devilla v. Schriver, 245 F.3d 192, 197 (2d Cir. 2001). "The doctrine of the law of the case posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case." Aramony v. United Way of Am., 254 F.3d 403, 410 (2d Cir. 2001) (citations omitted).

However, this doctrine is discretionary and a court "may depart from the law of the case for 'cogent' or 'compelling' reasons including an intervening change in law, availability of new evidence, or 'the need to correct a clear error or prevent manifest injustice.'" Johnson v. Holder, 564 F.3d 95, 99-100 (2d cir. 2009) (quoting United States v. Quintieri, 306 F.3d 1217, 1230 (2d Cir. 2002)). Having reviewed its prior decisions and the arguments put forth by the defendants, the Court holds that the law of the case doctrine is applicable in this case. This rule of law is applicable because the Court properly applied the legal standards in the ERISA and violation of a

Trust Agreement causes of action. The Court declines to reopen what has been decided.

Initially, as to the contention that "there is no dispute that all claims and expenses of CAAIG were paid throughout its existence," a review of the record does not reveal that all the Plan claims and expenses were paid. There is no such evidence in this case.

Also, the defendants' assertion that the plaintiffs' case "consisted exclusively of the testimony of Anthony Macaluso" (Dfts' Brief at 5) is not accurate. The record reveals that the plaintiffs' case in this hearing on damages was supported by documentary evidence, including the financial statements of CAAIG and, of importance, the Sedgwick Report dated May 13, 1998.

The defendants also contend that, based on William Rowley's testimony at the trial, "the contributions were adequate to maintain appropriate reserves from 1992 through September 1996." (Dfts' Brief at 13). However, during the liability trial, Rowley testified that "The Plan reserves were significantly reduced for the twelve months of reserves recommended by him." (Tr. at L1059). In addition, Rowley testified that there was a discussion with the CAAIG Board of Trustees where he recommended that the reserves be increased to cover the required twelve months of reserves. (Tr. at L1065).

As to the amount of the contributions to be paid by the agencies each year, the defendants contend that the reserves were limited to one year of paid claims only, not one year of paid claims and expenses. The Trust Agreement does not specify the amount of contributions to be paid by the agencies each year. The Agreement provides that, "The corporations shall make the necessary contributions to provide the benefits expected to become payable under this Trust to payees and distributees under any plan." (Pltfs' Ex. 12). However, the evidence at the trial

revealed that the annual required contributions necessary to adequately fund the benefits to be disbursed, include the amount of paid claims and the expenses for the prior year in addition to a reserve for unanticipated claims and increased cost of claims and expenses as a result of inflation. The defendants' own witness, William Rowley, who was an advisor and consultant to CAAIG, whose job involved giving advice "involving the issue of reserves," (Tr. at 1394) testified that the required reserves do include administrative expenses. (Tr. at 1052, 103 and 1056).

A review of the Rowley testimony clearly indicates that the amount of annual contributions needed to adequately fund the Plan is twelve months of the prior year's paid claims and expenses, plus a reserve to the prior year's paid claims and expenses.

The plaintiffs' expert also testified that the Plan must have sufficient reserves to cover the Plan's claims and expenses in order to remain solvent. In addition, the defendants' expert concurred. In the letter from Sedgwick Noble Lowndes to John Kearse dated May 13, 1998, in his premium projections, he stated: "In addition, the Fund operating and claims administrative expenses were factored into the premiums." (Dfts' Ex. D-B).

The defendants challenged the qualifications of Anthony Macaluso to testify as an expert. After an extensive voir dire, the Court ruled that Macaluso was qualified to testify as an expert in this case involving contributions in a health plan even though he had not had actual experience in determining the amount of reserves or premiums in a health plan. The applicable rule was clearly set forth by Judge Scheindlin in <u>Santoro v. Donnelly</u>, as follows:

> "Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to

suggest bad faith or to be in essence an apples and oranges comparison, other contentions that are unfounded go to the weight, not the admissibility of the testimony.  The question is not whether the engineer is an expert on the exact issues presented in the case, but rather, whether his general engineering experience qualified him to testify in an area in which he does not have extensive experience.  'Where an expert has the education or background to permit him to analyze a given set of circumstances, he can through reading, calculations, and reasoning from known scientific principles make himself very much an expert in the particular product even though he has not had actual experience in its manufacture.'"

340 F. Supp. 2d 464, 473 (S.D. N.Y. 2004) (quoting Lappe v. American Honda Motor Co., 857

F. Supp. 222, 226-227 (N.D. N.Y. 1994).

    See also Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) (". . . other

contentions go to the weight, not the admissibility of the testimony"); Tyler v. Bethlehem Steel

Corp., 958 F.2d 1176, 1188 (2d Cir. 1992) cert. denied 506 U.S. 876, 113 S.Ct. 82, 121 L.Ed.2d

46 (1992).

    The Court has already qualified Macaluso as an expert, in the following language:

THE COURT:          However, on the issue itself; I find that this witness is qualified for
                    the following reasons:

                    He is a certified public accountant for some 30 plus years; he
                    started off with a small accounting firm and then spent 12 years
                    with a large firm in which he did audit welfare plans; he is now the
                    controller of St. John's University, the chief financial officer of St.
                    John's University with experience in their welfare plan, and as
                    controller made decisions as to the health plan.

                    He audited more than five welfare plans.  He has a general business
                    knowledge as to these plans.  And in St. John's, as I understand it,
                    they have a very expensive and complicated plan, some 20 million

dollars a year or something like that.

He doesn't have to be the foremost expert in the world to testify in this kind of case. He doesn't have to determine the formula or the prices himself, or even be familiar with them to be an expert in this kind of case.

He is basing a lot of his testimony on the previous witness, Mr. Rowley, and on financial statements and records of CAAIG. There have been many experts who have testified in this court and in other courtrooms where I was involved that have not got this witness's background.

A lot of the matters that counsel brought up which they say would preclude him as an expert are really subject to cross-examine as to his opinion. That's another matter. I'm not getting into that.

As far as also that he didn't speak to the plaintiffs, I think that's a credit, myself.

So I'm denying your objection to this witness as an expert. And I find he is an expert sufficient to testify in this case.

(Tr. at D71-73).

The Court reaffirms its prior decision that Macaluso was qualified to testify as an expert. Further, the Court finds that Macaluso had a reasonable basis to rely on the Rowley method to calculate the amount of annual unpaid contributions. Also, the Court finds that Macaluso properly utilized some of the assumptions contained in the Sedgwick Report. He had a right to adopt the Sedgwick assumptions including the inflation rate factors of 10% for medical costs and

5% for other costs and expenses in his determination of the amount of necessary contributions to adequately fund the Plan.

The defendants' objections to applying a prospective inflation rate rather than utilizing known "active costs," is without merit. The annual payment obligations are calculated at the end of each fiscal year. Damages for failure to pay the required payments can be determined in the same manner. Therefore, the Court finds that the Sedgwick inflation rate factors adopted by Macaluso as reasonable assumptions for the period from 1995 to June 30, 1998, were viable. In addition, as opposed to the defendants' contentions, Macaluso properly considered a variety of different factors in his determination of the required reserves.

Therefore, contrary to the defendants repeated assertions, the Court finds that the analysis and conclusions by Macaluso as to the amount of reserves and annual unpaid contributions due to the Plan were based on reliable assumptions and methodology and were proper and adequate to support his conclusions.

Therefore, the Court finds that the plaintiffs have established the amount of damages in this matter, with reasonable certainty. A mathematically precise evaluation is unnecessary. The rule as to the "certainty" of damages was clearly set forth in Boyce v. Soundview Tech. Group, Inc., 464 F.3d 376, 391 (2d Cir. 2006):

> We have also instructed that where "'the existence of damage is certain, and the only uncertainty is as to its amount, . . . the burden of uncertainty as to the amount of damage is upon the wrongdoer.'" Id. (quoting Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 926 (2d Cir. 1977)). Further, in Contemporary Mission, this Court instructed that "the test for admissibility of evidence concerning prospective damages is whether the evidence has any tendency to show their probable amount. The plaintiff need only show a 'stable foundation for a reasonable estimate,'" of damages to which he is entitled as a

result of the breach. 557 F.2d 926 (quoting Freund v. Wash. Square Press, Inc., 34 N.Y.2d 379, 383, 357 N.Y.S.2d 857, 861 (1974) (internal citation omitted)). Relatedly, the Contemporary Mission Court also reiterated that "[e]vidence need not be conclusive in order to be relevant." Id. at 927. Indeed, more recently we noted that "when reviewing the sufficiency of the damages evidence, we are guided by the principle that if a plaintiff has shown it more likely than not that it has suffered damages, the amount of damages need only be proved with reasonable certainty." Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 496 (2d Cir. 1995) (citing W.L. Hailey & Co. v. County of Niagra, 388 F.2d 746, 753 (2d Cir. 1967) (collecting New York cases)).

It is clear that a wrongdoer has no right to insist upon a mathematically precise evaluation of the damages suffered. However, in this case the damages set forth by the testimony of Anthony Macaluso does have a mathematically precise evaluation. His testimony as to the evaluation of the unpaid contributions due to the Plan was based on the Rowley and Sedgwick assumptions and his own extensive experience and knowledge, as set forth in the Reports. (Pltfs' Exhibits D-1 and D-2). The Court further notes that no expert has been produced by the defendants to disprove or even contradict Macaluso's opinions and his reasonable reliance on Rowley's testimony, the Sedgwick assumptions and CAAIG's financial data. Accordingly, Macaluso's opinions as to the amount of the unpaid reserves is accepted by the Court.

Continuing to respond to their multiple contentions, the defendants also assert that the amount of the judgment entered by the class plaintiffs in the prior action on May 25, 2000 provides "a ceiling over which no damage can be awarded." (Dfts' Brief at 26). Again, the Court disagrees. In the prior action, the Court ruled that after L.I. Head Start withdrew from CAAIG as of September 1, 1992, its reserves, consisting of contributions made on behalf of the L.I. Head Start participating employees, belonged to these employees, for the payment of their medical benefits. According to the plaintiffs, in that matter, there is an unpaid judgment in the

sum of $757,456.38 plus interest.  See <u>L.I. Head Start</u>, 448 F. Supp. 2d at 383-84.

In the prior lawsuit, the judgment was in favor of the plaintiffs in that action, for the amount of reserves paid on behalf of L.I. Head Start employees and used by the other participants.  This case consists of a derivative cause of action, brought by the derivative plaintiffs on behalf of the CAAIG Fund.  In this case, the recovery for the unpaid contributions due to CAAIG is for the benefit of the Fund, not for the plaintiffs.  The Court noted the derivative nature of the claim in its decision when it stated that: "The Court accepts the plaintiffs' contention that this action is brought in a representative capacity for the beneficiaries of CAAIG as a whole . . ." <u>L.I. Head Start</u>, 634 F. Supp. 2d at 298.  Contrary to the defendants' assertion, the judgment in the prior action does not "provide a ceiling over which no damages can be awarded."  (Dfts' Brief at 26).  In fact, that prior judgment has no relation to the damages to be awarded to the plaintiffs in this action.  Therefore, the Court finds that the judgment entered in favor of the plaintiffs in the prior action has no bearing on the damages to be awarded to the plaintiffs in this case in their derivative capacity.

The defendants also contend that ERISA does not provide remedies other than those expressly set forth by Congress in the ERISA statute.  (Dfts' Brief at 26).  So that, say the defendants, unless ERISA provides an express remedy, there can be no cause of action under that statute.  They further assert that welfare benefit Plans, such as the CAAIG "are exempted by the statute from minimum funding requirements."  29 U.S.C. § 1003.  Also, the defendants follow up on this theory by citing to <u>Curtiss-Wright Corp. v. Schoonejongen</u>, 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed. 2d 94 (1995), which stated that "ERISA does not . . . establish any minimum participating vesting or funding requirements for welfare plans as it does for pension plans."  The

defendants therefore conclude that the plaintiffs' only claim against the defendants must therefore arise from the Trust Agreement, and "because the defendants complied with the obligations imposed by the Trust Agreement . . . plaintiffs can be awarded no damages under ERISA." (Dfts' Brief at 29).

It is clear that even if the ERISA statute imposes no minimum funding requirements for welfare plans, if there is a separate contractual duty to provide those benefits, it will be enforced. The applicable rule is set forth in a case cited by the defendants, Frulla v. CRA Holdings, Inc., 596 F. Supp. 2d 275, 283-84 (D. Conn. 2009):

> "Even if ERISA itself imposes no minimum funding requirement for welfare plans, CRA is contractually obligated to provide and fund benefits under the Plan as a result of the Agreed Judgment. See Frulla, 543 F.2d at 1252-54.
>
> *   *   *   *   *
>
> Even if CRA's underlying funding obligation stems from the Agreed Judgment (and hence lies in contract), that fact does not relieve fiduciaries of their responsibility under ERISA to ensure that a sponsor funds a Plan of a type it is contractually obligated to fund."

The rule was well-stated in Phaler v. Nat'l Latex Prods. Co., 517 F.3d 816, 833 (6th Cir. 2007):

> "Nor does ERISA establish any minimum participation, vesting or funding requirements for welfare plans." Id. Because ERISA does not require an employer to fund a plan, a plan fiduciary "is not duty-bound to bring suit to collect contributions from an employer unless an employer is bound contractually to . . . make those contributions." See Bagsby v. Cent. States, Se. & Sw. Areas Pension Fund, 162 F.3d 424, 431 (6th Cir. 1998)."

In the prior decision, the Court determined that "The Trust Agreement obligated each

participating employer to make the necessary contributions so as to provide the required benefits to payees and distributees under the Plan. The governing Trust Agreement that established CAAIG at Section 3 states the following: . . . The Corporations shall make the necessary contributions to provide the benefits expected to become payable under the Trust to payees or distributees under any plan." <u>L.I. Head Start</u>, 634 F.Supp. at 311.

Finally, in the conclusion of their Point III, the defendants raise the issue of a "set-off". In this regard, the defendants make the following statement: "Finally, the Court has expressly determined that the CAAIG has a 'right' to use the L.I. Head Start reserves, and that it was fair and reasonable to do so. As a result, even assuming arguendo, that plaintiffs established causation, a set-off is appropriate." (Dfts' Brief at 31). The Court is somewhat puzzled by this allegation in Defendants' Post-Trial Brief. This subject was referred to in the Court's prior decision as follows:

> Under the terms of the Trust Agreement, each participating agency is obligated to make the "necessary contributions" to provide the benefits payable to the employees involved. However, beginning in the year 1995, there were insufficient funds in the Plan to pay the medical claims of the employees and the administrative expenses of CAAIG. The evidence at the trial revealed that starting in 1995 and continuing to March 2001, the defendants used the L.I. Head Start reserve funds to pay these claims and administrative expenses, because of the lack of sufficient contributions. <u>Notwithstanding their right to use these reserves, the defendants were obligated to increase their own contributions to the Plan. They failed to do so.</u>

<u>L.I. Head Start</u>, 634 F. Supp. at 311. (emphasis supplied).

Therefore, the defendants cannot offset the L.I. Head Start reserves to evade their contractual obligations under the provisions of the Trust Agreement. Stated again, the Court has ruled that unpaid contributions were due and owing to the Plan and it was the only purpose of

this last hearing to determine the amount of the unpaid contributions.

## II.  Discussion

### A.  The Purpose of the Hearing

In prior decisions, the Court determined that the defendants violated their fiduciary duties under the provisions of ERISA, by failing to make the necessary contributions to adequately fund the CAAIG Plan.  The Court directed that there be a hearing on the issue of damages, which was held.  The Court will now resolve the issue of damages.

### B.  Damages - Failure to Make the Necessary Contributions to Fund the Plan

As stated previously in the two prior liability decisions in this case, <u>L.I. Head Start Child Dev. Servs. Inc. v. EEOC of Nassau County, Inc., et al.</u>, 634 F. Supp. 2d 290 (E.D.N.Y. July 8, 2009), and <u>L.I. Head Start Child Dev. Servs. Inc. v. EEOC of Nassau County, Inc., et al.</u>, No. 00-CV-7394, DE #212 (E.D.N.Y. May 28, 2010), the Court determined that the defendant agencies and John Kearse violated their fiduciary duty under the provisions of ERISA and the Trust Agreement, by failing to make the necessary contributions to adequately fund the Plan.  In this regard, although the Court found that the diversion of the L.I. Head Start reserves was not a violation, doing so did not preclude the defendant agencies from making the required contributions.  As stated by the Court, the ruling was as follows:

> In this case, the Court has determined that this diversion was not a violation of the defendants' duties under the ERISA statue.  However, the Court also finds that the defendant agencies violated their fiduciary duty under the provisions of ERISA, by failure to make the necessary contributions to adequately fund the Plan.  The Trust Agreement obligated each participating employer to make the necessary contributions so as to provide the required benefits to payees and distributees under the Plan.

The governing Trust Agreement that established CAAIG, at Section 3.1, states the following:

*Management and Control of Trust Fund Assets*

3.1 *The Trust Fund*. The term "Trust Fund" comprises all property of every kind held or acquired by the Trustee under this Agreement. The Corporations shall make the necessary contributions to provide the benefits expected to become payable under this Trust to payees or distributees under any plan. (Plfs. Ex. 12).

Under the terms of the Trust Agreement, each participating agency is obligated to make the "necessary contributions" to provide the benefits payable to the employees involved. However, beginning in the year 1995, there were insufficient funds in the Plan to pay the medical claims of the employees and the administrative expenses of CAAIG. The evidence at the trial revealed that starting in 1995 and continuing to March 2001, the defendants used the L.I. Head Start reserve funds to pay these claims and administrative expenses, because of the lack of sufficient contributions. Notwithstanding their right to use these reserves, the defendants were obligated to increase their own contributions to the Plan. They failed to do so. The record indicates that the reserves were reduced from $1,088,340 in 1995; to $474,924 in 1996; to $373,054 in 1997; and then further reduced until depleted in March 2001. (See Plfs. Ex. 5).

L.I. Head Start, 634 F.Supp. 2d at 311.

Also, in the later May 28, 2010 decision, the Court discussed this same situation and made the same ruling, including:

Notwithstanding their perceived right to use these reserves, the defendants, nevertheless, were obligated to increase their own contributions to the Plan. They failed to do so. The record indicates that the reserves were reduced from $1,088,340 in 1995; to $474,924 in 1996; to $373,054 in 1997; and further reduced until depleted in March 2001. (See Plfs. Ex. 5).

(May 28, 2010 Decision at 17).

The defendants' main contention is that there are no damages because all the claims and Plan expenses were paid.  Therefore, the defendants assert that they have complied with their obligations under the Trust Agreement to make the necessary contributions to adequately fund the Plan.  Not so, said the Court previously when it determined that the agencies failed "to make the contributions agreed upon in their Trust Agreement."  Id. at 311.  Instead, in part at least, the agencies used the L.I. Head Start reserves to make the necessary contributions to adequately fund the Plan.

## C.  **The Period Involved**

In the Plaintiffs' Post-Trial Reply Brief, plaintiffs' counsel conceded that the statute of limitations restricts the damages to the time period between 1995 and June 30, 1998.  The plaintiffs concession was stated as follows:

> Notwithstanding defendants' failure to raise their statute of limitations contention at the damage hearings, and in the interest in fairness, defendants are correct in limiting the damages to the "time period from 1995 to June 30, 1998," rather than from 1993.  (Def. Br. at 23).

> Accordingly, the specific unfunded contributions for the four year period from 1995 to June 30, 1998, as set forth in Macaluso's reports, are hereby adjusted by deleting the 1993 and 1994 years from the Reports.

Id. at 20.

## D.  **The Trust Agreement**

The defendants also deny liability in their assertion that ERISA does not require funding for welfare plans.  (Dfts' Brief at 26).  However, this assertion is not viable because as stated above, the Court has determined that the defendants breached their obligations under the Trust Agreement.

**E.  As to the Liability of the Estate of John L. Kearse**

The defendant Estate of John L. Kearse again raises the issue of the personal liability of John L. Kearse.  The Estate contends that Kearse "acted only as the representative of Nassau EOC as a fiduciary of the Plan and nothing in the governing documents imposed any duty upon him outside of that capacity."  (Dfts' Brief at 32).  In this regard the Estate cites to Dardeganes v. Grace Capital Inc., 889 F.2d 1237, 1242-43 (2d Cir. 1989), which held that personal liability can be imposed on a corporate officer exercising fiduciary duties when the trust agreement expressly provided that the individual defendant "shall personally supervise and manage the account."  In this case says the Estate, the Trust Agreement expressly provides that the corporations were the administrators of the Plan.  Also, the Estate asserts that Kearse "acted only as the representative of Nassau EOC as a fiduciary of the Plan and nothing in the governing documents imposed any duty upon him outside of that capacity.  He is therefore not individually liable under Dardeganes."  (Dfts' Brief at 32).

In addition, the Estate cites to § 409(b) of ERISA, which states that "No fiduciary shall be liable with respect to a breach of fiduciary duty under the subchapter if such breach was committed before he became a fiduciary or after he ceased to be the fiduciary."  29 U.S.C. § 1109(b).  Therefore, since Kearse resigned as a trustee and fiduciary of the CAAIG Plan pursuant a Consent Judgment dated October 5, 1996 (Pltfs' Ex. 54) (634 F. Supp. 2d at 303), liability can be imposed on him for only the one year period from 1995 until his resignation in 1996.  Also, during that one year period, the Estate contends that Kearse fulfilled his obligations with regard to contributions from the defendant agencies and employees.

In their final contention in this regard, the Estate asserts that there can be no liability imposed on Kearse because any failure to adequately fund the Plan arose from his dual role as Chief Executive Officer of Nassau EOC and his role with the Plan. "Here any failure by Kearse to cause his agency to increase their contributions was similarly made on behalf of the agency, for which no liability under ERISA can be imposed." (Dfts' Brief at 33, 34).

In responding to this contention by the Estate of John L. Kearse, the Court first revisits its discussion of this subject in the July 8, 2009 decision.

(E) As to the Liability of the Estate of John L. Kearse

[13] A discussion of this subject must commence with the ERISA statute governing the personal liability of a trustee who violates his fiduciary duty. The ERISA statute at issue here is 29 U.S.C. § 1109(a), which provides:

§ 1109. Liability for breach of fiduciary duty

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach.

As stated previously, the Court has determined that Kearse violated a number of ERISA statutory requirements and, in so doing, breached his fiduciary duties. Kearse violated his duties by (1) permitting the defendants to fail to make the necessary contributions to adequately fund the Plan; (2) engaging in prohibited transactions between the Plan and parties in interest; and (3) for Kearse's failure to take measures to collect the $9,000 owing to CAAIG from EEOC Suffolk, which constitutes a lending of money which is a prohibited transaction. See 29 U.S.C. 1106(a)(1)(B).

L.I. Head Start, 634 F. Supp. 2d at 315.

Further, in the prior July 8, 2009 decision, in effect the Court found that Kearse had the dominant role in the operation of CAAIG. Adrian Fassett was the CEO of Yonkers CAP and a trustee of CAAIG from May 1993 to June 1998. In his deposition, Fassett testified that the trustees voted to allow Kearse to be the Administrator of CAAIG and "in effect run the CAAIG Plan" and "they gave him responsibility for the day to day administration and speaking of the CAAIG." Id. at 301.

> Further, the trustees of CAAIG delegated to Kearse the authority to monitor the financial status of CAAIG on a constant basis. In addition, the decisions to increase the premiums were made by Kearse. Stated simply, the trustees delegated complete authority to Kearse to administer and operate the CAAIG plan. (Tr. at 655).

Id.

As the undisputed major administrator and fiduciary of CAAIG, Kearse was also subject to the terms of Section 409(a) of ERISA, 29 U.S.C. § 1109(a), which provides that a fiduciary who breaches a duty imposed by ERISA, "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach."

The Court has already determined that Kearse is personally liable for his breach of fiduciary duty as the major player in the CAAIG Organization, for the reasons stated in the July 8, 2009 decision. Nothing presented by the defendants in their Joint Post-Trial Brief would in any way serve to change such a clear decision. However, the Estate has raised the new issue that Kearse should not be liable for damages beyond October 5, 1996 because, "As the Court determined, Kearse resigned as a trustee and fiduciary pursuant to a Consent Judgment (Pltfs' Ex. 54) effective October 5, 1996. L.I. Head Start, 634 F. Supp. 2d at 303. At most, there can

only be liability imposed on Kearse for the one year period from 1995 until his resignation." (Dfts' Brief at 33). The Court disagrees.

The record is clear that, notwithstanding the Consent Judgment Kearse continued as the main fiduciary in the Plan until June 30, 1998. In this regard, counsel for Kearse entered into a "Stipulation of Uncontested Facts." (Pltfs' Ex. 3). Paragraph 16 of the Stipulation reads as follows:

> 16. Defendant Kearse served as a trustee of CAAIG since its inception in 1983 to June, 1998. Adrian Fassett ("Fassett") also served as a trustee of CAAIG from 1993 to June 11, 1998, when he resigned as trustee. Edward Hull ("Hull") also served as a trustee of CAAIG from 1994 to June 11, 1998, when he resigned as a trustee. [Answer to plaintiffs' Interrogatory No. 2, Breslow Letter of 12/7/01; Plaintiffs' 56.1 Statement, #18].

In fact, during the damages trial, the Court ruled in favor of the defendants with regard to the binding effect of the Stipulation of Undisputed Facts, and stated: "A stipulation is generally a binding document. If anything can be stronger than a contract, a stipulation by attorney is." (Tr. at D 460). Therefore, the defendants are held to their stipulated fact that Kearse served as a trustee of the Plan until June 30, 1998.

Further, as pointed out by the attorney for the plaintiffs, there is also documentary evidence in this case that reveals that Kearse was a CAAIG fiduciary as of June 1998. An annual report was filed by CAAIG with the Internal Revenue Service for the fiscal year ended August 31, 1996. ("Form 5500"). The CAAIG annual report was signed by Kearse as Plan Administrator on June 30, 1998. (Pltfs' Ex. 67). Also for the fiscal year that ended on August 31, 1987, CAAIG filed another annual Form 5500, which was signed by Kearse as Plan Administrator on June 30, 1998. So that Kearse was, apparently, the Plan Administrator in

26

charge of CAAIG, notwithstanding the terms of the Consent Judgment, until June 30, 1998. As such, his Estate is liable for the damages involved in this case.

## F.  As to the "Government Grants" Defense

Another issue raised by the defendants is their contention that the participants received grants from governmental agencies as the exclusive source of their contributions. The defendants therefore assert that there is a prohibition against the use of such governmental funds to satisfy a judgment. Initially, the Court agrees with the plaintiffs' counsel that this issue should have been raised in the liability trial. This is an assessment of damages. In addition, it is not at all clear that only government funds were used by the participants. Doris Cuellar, the current comptroller of EOC Nassau, testified that that agency does receive non-governmental funds from private sources. (Tr. at D502-505). Accordingly, for these reasons, the so-called "Governmental Grant" defense will not preclude the determination of damages in this case.

## III.  Determinations

In the Court's two prior decisions dated July 8, 2009 and May 28, 2010, among other rulings, the Court made the following determination:

> "The plaintiffs have established, by a preponderance of the evidence, that the defendants EOC Nassau, EOC Suffolk, Yonkers CAP and the Estate of John L. Kearse violated their fiduciary duties under the provisions of ERISA, by failing to make the necessary contributions to adequately fund the CAAIG Plan. The parties shall appear for a damages hearing on this issue . . .."

The Court held damages hearings on July 23, 2010, October 22, 2010, November 12, 2010, January 3, 2011, January 4, 2011 and January 6, 2011. After an exchange of post-trial briefs, the Court now makes its determinations as to the amount of monetary damages due to the CAAIG Plan.

## A. **The Hearing**

As stated above, Anthony Macaluso, the plaintiffs' expert witness, is a certified public accountant. He is the Chief Financial Officer of St. John's University. Macaluso prepared a written analysis of CAAIG's financial statements and records. He calculated the amount of money needed to adequately fund the Plan for the period from the fiscal year that ended on August 31, 1993 to June 30, 1998, when the Plan was terminated. Macaluso relied primarily on the testimony of William Rowley, a witness for the defendants for the "one year of reserves" formula and to compute the unfunded contributions. (Tr. at D155-156 and 220). His Report (Pltfs' Ex. D-1), indicated that the total amount of unfunded contributions due to the Plan from the three defendant agencies for the period from 1993 to June 1998 is the sum of $918,273. Macaluso allocated the unfunded contributions due from each of the defendant agencies as follows: EOC Nassau $719,008; EOC Suffolk $122, 130 and Yonkers CAP $77,135. Macaluso computed these amounts based on the prior years paid benefit claims and the Plan's expenses, together with an additional year of reserves equal to the paid claims and expenses of the prior year.

Profile Commercial Corp. ("Profile") is a company that specialized in employee benefits and group health programs. Profile was retained by CAAIG to do its financial work from CAAIG's inception in 1983. William Rowley is the Vice President of Profile. His role is to manage employee benefit programs for corporations and businesses on Long Island. Rowley testified in the prior liability trial. Also, briefly, a portion of his deposition testimony was read in this damages hearing. Rowley testified that it was necessary for the Plan to have reserves. He testified in the liability trial as to the make up of the reserves which would include administrative

28

expenses as follows:

> Q. And in arriving again at the determination as to how much employers should be contributing to the fund each year, you would have certain factors to determine that amount for each employer?

> A. Yes.

> Q. What would those factors be?

> A. Claims from the previous year, projections for the coming year, and the need to sustain reserves within the plan.

> Q. So what you would do is, you would look at the claims history of the plan, see how many claims were paid out, I would assume also - - correct me if I'm wrong - - you would also determine the administrative expenses for the plan, maintaining of the office, maintaining the personnel, because that is part of the cost of the plan and you want to make sure that enough money comes in from the employers to cover the claims of the plan, and the administrative expenses.

> Would that be a correct statement?

> A. Yes.

(Tr. at 1052-53).

A reserve formula was also presented by Sedgwick, an actuarial consultant retained by EOC Nassau. Sedgwick presented a written report which included reserves. The Sedgwick Report recommended a range of six to nine months of claims and expenses as an adequate reserve to fund the Plan for the employees of EOC Nassau.

Macaluso submitted an alternative analysis which utilized the Sedgwick formula using reserves of seven and one-half months, which is the average between the six months and nine

months of reserves recommended by Sedgwick.  Using the Sedgwick formula of seven and one-half months of reserves for the 1993 to May 31, 1998 period, the unfunded contributions owed to the Plan from the three agencies is $727,833, broken down as follows: EOC Nassau $569,893; EOC Suffolk $96,802; and Yonkers CAP $61,138.

**B.  The Statue of Limitations**

In the Defendants' Joint Post-Trial Brief, they raise the question of the statute of limitations with regard to this lawsuit commenced in the year 2000.  In the prior liability decision, the Court held that:

> ". . . the Court finds that there was evidence adduced at the trial that this so-called 'diversion of trust funds' did occur between 1995 and March 2001.  Section 1113(1)(A) provides for claims of fiduciary breaches to be brought within six years after 'the date of the last action which constituted a party of, or the breach or violation . . ..'  Therefore, as the last act constituting part of this claim occurred as late as 2001, the Court find that this pleaded 'diversion' fiduciary violation cause of action is timely."

L.I. Head Start, 558 F. Supp. 2d at 403.

The defendants therefore contend that "all evidence addressing any failure to adequately fund the Plan before 1995 is therefore time barred."  (Dfts' Brief at 22).  Therefore, say the defendants; "The damages, if any, are limited to the time period between 1995 and June 30, 1998, when the Plan was terminated."  (Dfts' Brief at 22).

In response the plaintiffs' counsel states that: ". . . in the interest of fairness, defendants are correct in limiting the damages to the 'time period for 1995 to June 30, 1998,' rather than from 1993."  (Pltfs' Brief at 205).  The Court agrees.  Therefore, the Court will delete the 1993 and 1994 years from the plaintiffs' reports in evidence.  The adjusted amount of alleged unpaid

contributions, as supported by the Macaluso Reports are as follows:

**The "Rowley Method"**

| | | |
|---|---|---|
| Unfunded contributions for 1993 to June 1998 | | $918,273 |
| Less amount deducted for 1993 and 1994 | | - 85,328 |
| Total unfunded contributions for 1995 to June 30, 1998 | | $832,945 |

| Allocation Percentages and Amounts | | |
|---|---|---|
| EOC Nassau | 78.3% | $652,198 |
| EOC Suffolk | 13.3% | $110,782 |
| Yonkers CAP | 8.4% | $69,967 |
| Total unfunded contributions for 1995 to June 30, 1998 | | $832,945 |

The Court finds that the Rowley reserves formula is more accurate and appropriate than the Alternative Sedgwick Method in determining the measure of damages to the CAAIG Plan for the following reasons:

(1)  Primarily, during the relevant period, Rowley was the advisor to the trustees regarding the reserves and contributions to the Plan.  He had the most reliable information concerning the Plan and, apparently, the trustees relied on his advice.  (Tr. at 990-92, 1065 and 1394);

(2)  The Sedgwick Report was dated May 13, 1998, and the Plan was terminated the following month on June 30, 1998.  So that the Sedgwick Report did not cover the period between 1995 and May 13, 1998, the date of the Report; and

(3)  The Sedgwick Report involved only the employees of EOC Nassau and did not include projections for EOC Suffolk and Yonkers CAP.  (Dfts' Ex. D-B).

Accordingly, the Court finds that the plaintiffs have established, by a preponderance of the credible evidence, that the damages in this case, namely the necessary contributions to adequately fund the CAAIG Plan, for the period between 1995 and June 30, 1998, are in the total sum of $832,945.  The allocation percentages are as follows:

| | | |
|---|---|---|
| EOC Nassau | 78.3% | $652,198 |
| EOC Suffolk | 13.3% | $110,782 |
| Yonkers CAP | 8.4% | $69,967 |

## C.  As to Prejudgment Interest

The defendants contend that the plaintiffs may not recover prejudgment interest as of right under the provisions of CPLR § 5001.  The only additional reason raised by the defendants in their Joint Post-Trial Brief is "the delay on bringing the instant action, despite clear knowledge of the potential claims, as evidenced by the original action in 1993 . . .."  (Dfts' Brief at 35).  In exercising its discretion in a breach of fiduciary duty – ERISA cause of action, the Court previously determined that prejudgment interest was appropriate in this case.  In the Court's view the "delay" raised by the defendants is insufficient to preclude the award of prejudgment interest. In this case with its multiple participants and issues, any delay in bringing this action was reasonable and did not deprive the successful plaintiffs of their right to prejudgment interest.

## D.  As to Attorneys' Fees

The defendants assert that the "defendants had defeated plaintiffs on the 'major issue' – the alleged diversion of L.I. Head Start reserves (634 F. Supp. 2d at 308)."  (Dfts' Brief at 35).  It is apparent that this attempted defense to the grant of attorneys' fees is in fact an argument to reduce the attorneys' fees because the plaintiffs prevailed on only two of their causes of action,

and not in the "LIHS reserves" cause of action. In this case, involving a partial recovery, in fixing counsel fees the Court will examine whether the plaintiffs' partial success requires a reduction in the fee. As stated in <u>Grant v. Martinez</u>, 973 F.2d 96, 101 (2d Cir. 1992), "the district court examines whether the plaintiff failed to succeed in any claims wholly unrelated to the claims on which the plaintiff succeeded. The hours spent on such unsuccessful claims should be excluded from the calculation . . . If a plaintiff has obtained excellent results, however, the attorneys should be fully compensated." <u>See</u> <u>also</u> <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940 76 L.Ed. 2d 40 (1983); <u>Williams v. New York City Hous. Auth.</u>, 975 F. Supp. 317, 320 (S.D.N.Y. 1997) ("The hours spent in such unsuccessful claims should be excluded from the calculation." (quoting <u>Grant v. Martinez</u>, 973 F.2d 96, 101 (2d Cir. 1992)).

However, this issue will be confronted in the Court's determination of the amount of attorneys' fees, not whether the plaintiffs are entitled to such fees. The Court's determination to grant attorneys' fees to plaintiffs' counsel as a prevailing party was an exercise of its discretion in accordance with the rules in ERISA and for breach of a fiduciary duty. <u>See</u> 29 U.S.C. § 1132(g); <u>In re Unisys Corp. Retiree Med. Benefits ERISA Litig.</u>, 579 F.3d 220, 239 (3d Cir. 2009); <u>Hahnemann Univ. Hosp. v. All Shore Inc.</u>, 514 F.3d 300, 310 (3d Cir. 2008).

In addition, the defendants contend that they "do not have the ability to pay attorneys' fees and clearly should not be required to do so." (Dfts' Brief at 35). Previously, in the determination of fee awards under ERISA which are wholly discretionary, the Circuit Courts had adopted a five factor test including the capacity of the opposing party to pay an award. <u>See</u> <u>Janero v. Urological Surgery Prof'l Assn.</u>, 457 F.3d 130, 143 (1st Cir. 2006). However, recently, the Supreme Court explicitly overruled this five factor test and deemed it to be merely

discretionary and secondary to the Court's new test.  In <u>Hardt v. Reliance Standard Life Insurance Co.</u>, _____ U.S. _____, 130 S.Ct. 2149-2150, 176 L.Ed. 2d 998, (May 24, 2010), the Court ruled that a claimant must show "some degree of success on the merits" and more than "trivial success on the merits" or a purely procedural victory."  In the Court's view, the <u>Hardt</u> decision has undoubtedly lowered the rules for fee awards under ERISA, and, with reasonable certainty, reduced the effect of the so-called five-factor test, including the capacity to pay counsel fees.

Following this present decision, the Court will accept the plaintiffs' application for attorneys' fees and the opposition and make its rulings.

# IV. Conclusions

(1)  Judgment is rendered in favor of the plaintiffs against all of the defendants, Economic Opportunity Commission of Nassau County, Inc., Economic Opportunity Council of Suffolk, Inc., Yonkers Community Action Program, Inc. and Stella B. Kearse as Representative of the Estate of John L. Kearse, Deceased, in the total sum of $832,945.

(2) The allocation as between the three participating agencies, is as follows:  judgment is rendered in favor of the plaintiffs against the defendant EOC Nassau in the sum of $652,198; judgment is rendered in favor of the plaintiffs against the defendant EOC Suffolk in the sum of $110,782; and judgment is rendered in favor of the plaintiffs against the defendant Yonkers CAP in the sum of $69,967; plus costs.

(3)  Prejudgment interest on the unpaid contributions at the federal interest rate is awarded on these amounts from the end of each fiscal year, commencing with the fiscal year that ended on August 31, 1995 and the subsequent years that ended on August 31, 1996, August 31, 1997, and June 30, 1998, when the Plan was terminated.

(4)  As to the issue of prevailing party "reasonable attorneys fees," the plaintiffs' attorney is directed to serve and file his written request on or before November 7, 2011.  The defendants will have until November 21, 2011 to respond.  The plaintiff is permitted to reply by November 28, 2011.

**SO ORDERED.**


Dated: Central Islip, New York
       October 20, 2011



                                        _/s/ARTHUR D. SPATT_
                                           ARTHUR D. SPATT
                               United States District Judge